# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY, as subrogee of FROCK BROS. TRUCKING, INC., | ) ) ) ) | Case No. 08 CV 2799 |
| Plaintiff, | ) ) | Judge Dow |
| v. | ) ) | Magistrate Valdez |
| CUMMINS INC., | ) ) | |
| Defendant. | ) ) | |

## CUMMINS INC.'S MOTION TO TRANSFER VENUE

Cummins Inc. ("Cummins"), pursuant to 28 U.S.C. § 1404(a), respectfully moves the Court to transfer this case to the United States District Court for the District of Nebraska, Lincoln. In support of this motion, Cummins states as follows:

1.      The Northern District of Illinois is not the appropriate forum for this dispute.  The events that underlie the claims made by Plaintiff American Empire Surplus Lines Insurance Company ("American Empire" or "Plaintiff") all occurred in Antelope County, Nebraska, almost 600 miles away.  Virtually all potential material witnesses live in Nebraska.  The Court, moreover, will have to apply Nebraska law to resolve Plaintiff's claims.

2.      Plaintiff is a Delaware corporation with its principal place of business in Cincinnati, Ohio.  Plaintiff's insured, Frock Bros. Trucking, is a Pennsylvania corporation with its principal place of business in New Oxford, Pennsylvania.  With the sole exception of its counsel's office, neither Plaintiff nor its claims have any connection whatsoever with Illinois.

3.    The factors that guide the Court in passing on motions to transfer venue pursuant to 28 U.S.C. 1404(a) overwhelmingly support transfer of this matter from the Northern District of Illinois to the District of Nebraska.

4.    Cummins incorporates by reference its memorandum in support of this motion to transfer venue filed herewith.

Respectfully submitted,

CUMMINS INC.


_____/s/ Brendan J. Healey_____
Brendan J. Healey
MANDELL MENKES LLC
bhealey@mandellmenkes.com
333 West Wacker, Suite 300
Chicago, Illinois 60606
Telephone:  (312) 759-2158
Telecopier:  (312) 251-1010


J. A. Felton
Dan E. Cranshaw
LATHROP & GAGE L.C.
2345 Grand Boulevard
Suite 2800
Kansas City, Missouri 64108-2684
Telephone:  (816) 292-2000
Telecopier:  (816) 292-2001

ATTORNEYS FOR DEFENDANT

CC 2004895v5

## CERTIFICATE OF SERVICE

I hereby certify that I filed a copy of the foregoing with the Clerk of the Court using the ECM/ECF system.  I further certify that a copy of the foregoing *Cummins Inc.'s Motion to Transfer Venue* was served on May 16, 2008 by First-Class United States Mail, postage prepaid on the following counsel of record:

     Robert Ostojic
     ro@lefltd.com
     LEAHY, EISENBERG & FRAENKEL, LTD
     161 North Clark Street
     Suite 1300
     Chicago, IL  60601
     Telephone:  (312) 368-4554

                _____/s/ Brendan J. Healey_____
                An Attorney for Defendant

# Exhibit A

**State of Nebraska**
# Investigator's Motor Vehicle Accident Report

JWB #7

Sheet 1 of 1

| | | | |
|---|---|---|---|
| **1** Total Number of Vehicles | Local No./ District | Agency Case 5414 B2004-5417-09605 | **HIT & RUN?** ○ YES ⊘ NO |

STATE USE ONLY  1 4 2004

| | | | |
|---|---|---|---|
| **A/1 1** DATE OF ACCIDENT | M M / D D / Y Y Y Y  04 07 2004 | S M T W Th F S (☒ on W) | TIME OF ACCIDENT (In Military Time) 1 6 2 5 |

POLICE NOTIFIED

**A/2** PLACE OF ACCIDENT — COUNTY: ANTELOPE   CITY:

PRIVATE PROPERTY? YES ○ NO ⊘
ONE-WAY STREET? YES ○ NO ⊘

LATITUDE

**B 57** ROAD ON WHICH ACCIDENT OCCURRED — STREET/HIGHWAY NO. Highway 20

LONGITUDE

**C 1** DISTANCE FROM MILEPOST — FEET 1500   N S E W (☒ W)   OF MILEPOST 334   HIGHWAY NO. 20

SHOULD LOCATION HAVE ENGINEERING STUDY? ○ YES ⊘ NO

**D 1** IF AT INTERSECTION — NAME OF INTERSECTING ROADWAY | IF NOT AT INTERSECTION — 1500 FEET N S E W (x) OF NEAREST STREET, BRIDGE, RAILROAD CROSSING   mile marker 334

**V1/M 01** IF ACCIDENT WAS OUTSIDE CITY LIMITS, INDICATE DISTANCE FROM NEAREST TOWN

**V2/M** MILES 3   N S E W AND MILES (x)   N S E W OF NEAREST CITY OR TOWN   orchard

**E 2** R. WORK ZONE CODES  R1 R2 R3 R4  1    S. PEDESTRIAN CLASSIFICATION CODES  S1 S2 S3 S4 S5-a S5-b S6-a S6-b

CONTINUATION FORMS ATTACHED (Fill in all that apply)  ⊘ NONE  ○ TRUCK & BUS  ○ CONTINUATION

## VEHICLE NO. 1

**F 1** DRIVER LICENSE NO. R N 4 1 9 3 4 5   STATE (Of License) OH   SEX ○ FEMALE ⊘ MALE

LOCAL NO.

**V1/N 1** DRIVER  David H , Ratliff   PHONE ( 717 ) 309 - 6068   DATE OF BIRTH (MM/DD/YYYY) 07 / 03 / 1957   **V1/1 46**

**V2/N** DRIVER ADDRESS  po box 453   CITY, STATE, ZIP  New Oxford   PA 17350   **V1/2 02**

LOCAL NO.

**G 2** OWNER  Frock Bros. Trucking   PHONE 800 962- - 0445   CITATION ○ YES ⊘ PENDING ○ NO   CITATION NO.   **V1/3**

OWNER ADDRESS  po box 157   CITY, STATE, ZIP  New Oxford   PA 17350

**H 5** LICENSE PLATE NO. P T 7 5 4 3 c   YEAR (Plate Expires) 2 0 0 4   STATE (Of Plate) P A   **V1/4**

**V1/O 4** VEHICLE  YEAR 2001   MAKE Kenworth   MODEL   BODY STYLE conv   COLOR blk   ESTIMATED DAMAGE $total   **V1/5 02**

**V2/O** VEHICLE ID NO. (VIN) 1 x k w d 4 9 x x 1 j 8 6 0 7 9 8   INSURANCE COMPANY unknown   POLICY NO.   **V1/6 60**

TOWED TO  orchard   TOWED BY I80   unk

## VEHICLE NO. 2

**I 1** DRIVER LICENSE NO.   STATE (Of License)   SEX ○ FEMALE ○ MALE   **V2/1**

**V1/P 1** DRIVER   PHONE ( ) -   DATE OF BIRTH (MM/DD/YYYY) / /   **V2/2**

LOCAL NO.

**V2/P** DRIVER ADDRESS   CITY, STATE, ZIP

**J 01** OWNER   PHONE ( ) -   CITATION ○ PENDING ○ NO   CITATION NO.   **V2/3**

OWNER ADDRESS   CITY, STATE, ZIP

**K/1** LICENSE PLATE NO.   YEAR (Plate Expires)   STATE (Of Plate)   **V2/4**

**V1/O** VEHICLE  YEAR   MAKE   MODEL   BODY STYLE   COLOR   ESTIMATED DAMAGE $   **V2/5**

**V2/O** VEHICLE ID NO. (VIN)   INSURANCE COMPANY   **V2/6**

**K 01** TOWED TO   TOWED BY   POLICY NO.

**Complete this section for all injured persons**
(Complete a continuation report if more than three were injured)

| VEH. # | | DATE OF BIRTH (MM/DD/YYYY) | 1 Seat Position | 2 Eject | 3 Body Region | 4 Injury Sev. | 5 Trans. | SEX M F |
|---|---|---|---|---|---|---|---|---|
| VEH. # NAME | ADDRESS | / / | | | | | | |
| LOCAL NO | MEDICAL FACILITY NAME | EMS SERVICE NAME | | | | EMS RUN REPORT NO | | |
| VEH. # NAME | ADDRESS | / / | | | | | | |
| LOCAL NO | MEDICAL FACILITY NAME | EMS SERVICE NAME | | | | EMS RUN REPORT NO | | |
| VEH. # NAME | ADDRESS | / / | | | | | | |
| LOCAL NO | MEDICAL FACILITY NAME | EMS SERVICE NAME | | | | EMS RUN REPORT NO | | |

NEBR... DEPT.
CERTIFIED COPY
Robert A. Smit
ACCIDENT RECORDS BUREAU

DR Form 40, Jan 02

THIS FORM REPLACES DR FORM 40, JAN 96
PREVIOUS EDITIONS WILL BE DESTROYED.



THE FOLLOWING INFORMATION IS REQUIRED FOR ALL ACCIDENTS

INDICATE BY DIAGRAM WHAT HAPPENED

AGENCY CASE NO.
B04-5417-09605

Investigation made at scene?

Indicate North by Arrow

HIGHWAY #20

UNIT ONE WAS ON FIRE

Unit 1

NOT TO SCALE

DESCRIPTION OF ACCIDENT BASED ON OFFICER'S INVESTIGATION

Vehicle #1 was East bound on Highway #20 when had motor problems and driver pulled Vehicle#1 onto the shoulder of the road and got out. The truck then became engulfed in flame while parked on the shoulder. Vehicle 1 was pulling a Trailer, 2002 Great dane Vine 1graa06242w017402 with Plat Pt7543C out of PA. The trailer was loaded with potatoes.

| VEHICLE MOVEMENT BEFORE COLLISION | POINT OF IMPACT AND MOST DAMAGED AREA (Enter numbers for each vehicle) | AIRBAG DEPLOYED | RESTRAINT USE | TOTAL OCCUPANTS |
|---|---|---|---|---|

INVESTIGATOR NAME (Print or Type)
B Higgins

OFFICER NO
184

TROOP/TEAM/BEAT
B

DEPARTMENT
N.S.P.

DATE OF REPORT 06 / 01 / 20 4

INVESTIGATOR SIGNATURE  184

**State of Nebraska**
# Investigator's Supplemental Truck and Bus Accident Report
This form must be completed in **addition** to the DR Form 40, "Investigator's Motor Vehicle Accident Report," if any of the vehicles involved meet the criteria listed on the back of this form.

Sheet _2_ of _2_

| LOCAL NO./DISTRICT | DATE OF ACCIDENT | COUNTY | CITY | STATE USE ONLY |
|---|---|---|---|---|
| | 04 07 04 | Antelope | | JUN 1 4 2004 |

AGENCY CASE NO
B 2004-5417-09605

OCCURRED ON HIGHWAY/ROAD/STREET
Highway 20

## TRUCK / BUS - 1

DRIVER *(Print or type full name)*
David H  Ratliff

CARRIER NAME *(Print or type full name)*
Frck Bros, Trucking

CARRIER ADDRESS *(Street or R.F.D.)*
po box 157

CITY, STATE, ZIP
New  Oxford   PA 17350

**CARRIER IDENTIFICATION NO.**
1  U.S. DOT 223634
2  ICC MC ____

**GROSS VEHICLE WEIGHT RATING (GVWR) or GROSS COMBINATION VEHICLE WEIGHT RATING (GCVWR)** *(Combined rating for vehicles and trailers)*
☐ 10,000 Lbs. or Less *(Requires Haz Mat Placards)*
☐ 10,001 Lbs. – 26,000 Lbs.
☒ More than 26,000 Lbs.

TRAILER LICENSE PLATE
Year 2 0 0 4   State P A   No. P t 7 5 4 3 c

**COMMERCE CLASSIFICATION** *(Check one)*
1 ☒ Interstate Commerce
2 ☐ Intrastate Commerce
3 ☐ Not Applicable

**TRUCK WIDTH** *(Widest part of truck or trailer)*
1 ☐ 96 inches
2 ☒ 102 inches
3 ☐ Other *(Specify)*

**VEHICLE CONFIGURATION** *(Check one)*
2 ☐ Single-Unit Truck (10,001–26,000 Lbs. GVWR)
3 ☐ Single-Unit Truck (Greater than 26,000 Lbs. GVWR)
4 ☐ Truck tractor (bobtail)
5 ☐ Truck with Trailer
6 ☒ Tractor with Semi-Trailer
7 ☐ Tractor with Doubles
8 ☐ Tractor with Triples
9 ☐ Unknown Heavy Truck
37 ☐ Bus (seats 9-15, including driver)
38 ☐ Bus (seats 15+, including driver)
39 ☐ Haz Mat Passenger Car
40 ☐ Haz Mat Light Truck (van, mini van, pickup, sport utility) (10,000 Lbs. or less GVWR)

**CARGO BODY TYPE** *(Check one)*
1 ☐ Bus (seats 9-15, including driver)
2 ☐ Bus (seats 15+, including driver)
3 ☒ Van/Enclosed Box
4 ☐ Grain/Chips/Gravel
5 ☐ Pole
6 ☐ Cargo Tank
7 ☐ Flatbed
8 ☐ Dump
9 ☐ Concrete Mixer
10 ☐ Auto Transporter
11 ☐ Garbage/Refuse
12 ☐ Other *(Specify)*
13 ☐ Unknown

### HAZARDOUS MATERIAL INVOLVED
Did vehicle have a Haz Mat Placard?
1 ☐ Yes
2 ☒ No

Placard Information:
1-Digit Hazard Class Number from bottom of Diamond Placard.
1-Digit No. ____

Was hazardous cargo released? *(Do not count fuel from fuel tank)*
1 ☐ Yes
2 ☒ No

## TRUCK / BUS - 2

DRIVER *(Print or type full name)*

CARRIER NAME *(Print or type full name)*

CARRIER ADDRESS *(Street or R.F.D.)*      CITY, STATE, ZIP

**CARRIER IDENTIFICATION NO.**
1  U.S. DOT ____
2  ICC MC ____

**GROSS VEHICLE WEIGHT RATING (GVWR) or GROSS COMBINATION VEHICLE WEIGHT RATING (GCVWR)** *(Combined rating for vehicles and trailers)*
☐ 10,000 Lbs. or Less *(Requires Haz Mat Placards)*
☐ 10,001 Lbs. – 26,000 Lbs.
☐ More than 26,000 Lbs.

TRAILER LICENSE PLATE
Year    State    No.

**COMMERCE CLASSIFICATION** *(Check one)*
1 ☐ Interstate Commerce
2 ☐ Intrastate Commerce
3 ☐ Not Applicable

**TRUCK WIDTH** *(Widest part of truck or trailer)*
1 ☐ 96 inches
2 ☐ 102 inches
3 ☐ Other *(Specify)*

**VEHICLE CONFIGURATION** *(Check one)*
2 ☐ Single-Unit Truck (10,001–26,000 Lbs. GVWR)
3 ☐ Single-Unit Truck (Greater than 26,000 Lbs. GVWR)
4 ☐ Truck tractor (bobtail)
5 ☐ Truck with Trailer
6 ☐ Tractor with Semi-Trailer
7 ☐ Tractor with Doubles
8 ☐ Tractor with Triples
9 ☐ Unknown Heavy Truck
37 ☐ Bus (seats 9-15, including driver)
38 ☐ Bus (seats 15+, including driver)
39 ☐ Haz Mat Passenger Car
40 ☐ Haz Mat Light Truck (van, mini van, pickup, sport utility) (10,000 Lbs. or less GVWR)

**CARGO BODY TYPE** *(Check one)*
1 ☐ Bus (seats 9-15, including driver)
2 ☐ Bus (seats 15+, including driver)
3 ☐ Van/Enclosed Box
4 ☐ Grain/Chips/Gravel
5 ☐ Pole
6 ☐ Cargo Tank
7 ☐ Flatbed
8 ☐ Dump
9 ☐ Concrete Mixer
10 ☐ Auto Transporter
11 ☐ Garbage/Refuse
12 ☐ Other *(Specify)*
13 ☐ Unknown

### HAZARDOUS MATERIAL INVOLVED
Did vehicle have a Haz Mat Placard?
1 ☐ Yes
2 ☐ No

Placard Information:
1-Digit Hazard Class Number from bottom of Diamond Placard.
1-Digit No. ____

Was hazardous cargo released? *(Do not count fuel from fuel tank)*
1 ☐ Yes
2 ☐ No

INVESTIGATOR NAME *(Print or type)*
B Higgins

INVESTIGATOR SIGNATURE
184

DEPARTMENT
N. S. P.

OFFICER NO.
184

DATE OF REPORT
06/01/04

DR Form 174, Jan 02

MAIL TO: Accident Records Bureau, Nebraska Department of Roads, PO Box 94669, Lincoln, NE 68509-4669

# General Instructions

This supplemental report must be completed in *addition* to the DR Form 40, "Investigator's Motor Vehicle Accident Report" for any:

1. Truck with a Gross Vehicle Weight Rating (GVWR) or Gross Combination Vehicle Weight Rating (GCVWR) of 10,001 pounds or more;

2. Vehicle displaying a hazardous materials placard; or

3. Bus designed to transport nine or more passengers, *including* the driver.

You will need to complete additional supplementary forms if more than two trucks/buses were involved in the accident.

## Data Elements

1. **Agency Case Number:** If your agency has assigned an internal case number to the accident, enter the number just as you did on the Investigator's Motor Vehicle Accident Report.

2. **Date of Accident and Location Information:** Enter this information just as you did on the Investigator's Motor Vehicle Accident Report.

3. **Driver Name:** Copy the name of the truck or bus driver from the Investigator's Motor Vehicle Accident Report.

4. **Gross Vehicle Weight Rating (GVWR) and/or Gross Combination Vehicle Weight Rating (GCVWR):** The Gross Vehicle Weight Rating (GVWR) is the weight specified by the manufacturer. The Gross Combination Vehicle Weight Rating (GCVWR) for a vehicle towing a trailer or trailers is the sum of the ratings for each unit. Check the appropriate box.

5. **Carrier Name and Address:** A motor carrier is defined as the person, company, or organization responsible for directing the transportation of the cargo or persons. The owner of the vehicle is often not the carrier. For further explanation, consult the "Instructions for Completing the Investigator's Motor Vehicle Accident Report" *(revised edition 2001).*

6. **Carrier Identification Number:** Vehicles engaged in intrastate/interstate transport have either a six- or seven-digit US DOT or ICC MC number. Some trucks may not have an identifying number.

7. **Trailer License Plate:** If a truck has an attached trailer with a separate license plate, enter the following information in the boxes provided: the license plate number of the trailer, the state of issuance, and the year of registration as displayed.

8. **Commerce Classification:** Check the "interstate commerce" box if the commercial vehicle can legally trade, traffic, or transport property across state lines. Mark the "intrastate commerce" box when the commercial vehicle is restricted to commerce within one state.

9. **Truck Width:** Measure the widest part of the truck or trailer and then check the appropriate box. If "other" is checked, specify the width in inches on the line provided.

10. **Hazardous Material Involvement:** Determine if the vehicle has a Hazardous Material Placard and then indicate the 1-digit Hazard Class Number located on the bottom of the Diamond Placard.

11. **Vehicle Configuration:** Check the appropriate box.

12. **Cargo Body Type:** Check the appropriate box.

13. **Investigating Officer Information:** Complete this section and be sure to *sign* the report.

# Exhibit B

Business Entity



# Corporations

Online Services | Corporations | Forms | Contact Corporations | Business Services

Search
By Business Name
By Business Entity ID
Verify
Verify Certification
Online Orders
Register for Online
Orders
Order Business List
My Images
Search for Images

### Business Entity Filing History
**Date: 5/14/2008**
(Select the link above to view the Business Entity's Filing History)

## Business Name History

| Name | Name Type |
|---|---|
| FROCK BROS. TRUCKING, INC. | Current Name |

## Business Corporation - Domestic - Information

| | |
|---|---|
| **Entity Number:** | 753986 |
| **Status:** | Active |
| **Entity Creation Date:** | 5/13/1982 |
| **State of Business.:** | PA |
| **Principal Office Address:** | RD #3 NEW OXFORD PA 17350-0 |
| **Mailing Address:** | No Address |

## Officers

| | |
|---|---|
| **Name:** | FROCK,J DANIEL |
| **Title:** | President |
| **Address:** | PO BOX 157 NEW OXFORD PA 17350-0 |

| | |
|---|---|
| **Name:** | RAUHAUSER,LISA L |
| **Title:** | Secretary |
| **Address:** | PO BOX 157 NEW OXFORD PA 17350-0 |

| | |
|---|---|
| **Name:** | FROCK,J DANIEL |
| **Title:** | Treasurer |
| **Address:** | PO BOX 157 NEW OXFORD PA 17350-0 |

| | |
|---|---|
| **Name:** | FROCK JR,EDMOND B |
| **Title:** | Vice President |
| **Address:** | PO BOX 157 NEW OXFORD PA 17350-0 |

http://www.corporations.state.pa.us/corp/soskb/Corp.asp?522598

Home | Site Map | Site Feedback | View as Text Only | Employment



Home

Copyright © 2002 Pennsylvania Department of State. All Rights Reserved.
Commonwealth of PA Privacy Statement

# Exhibit C

D&B Business Information Report: AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY   Page 1 of 7



# Business Information Report

To save report(s) to your PC, <u>click here for instructions</u>.                    📄 <u>Print this Report</u>

Copyright 2008 Dun & Bradstreet - Provided under contract for the exclusive use of subscriber 065007804L

**BUSINESS SUMMARY**

**AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY**
   (SUBSIDIARY OF GREAT AMERICAN INSURANCE COMPANY (INC), CINCINNATI, OH)
**580 Walnut St**
**Cincinnati, OH 45202**

This is a **headquarters (subsidiary)** location.
Branch(es) or division(s) exist.

| | |
|---|---|
| Mailing address: | PO Box 5370<br>Cincinnati, OH 45201 |
| Web site: | www.aeslic.com |
| Telephone: | 513 369-3000 |
| Fax: | 513 369-3062 |
| Chief executive: | ROBERT A NELSON, PRES |
| Year started: | 1977 |
| Employs: | 112 (57 here) |
| Sales: | $24,900,000 |
| History: | CLEAR |
| SIC: | 6331 |
| Line of business: | Property & casualty insurance |

**Now Included with this Report**  NEW!

**D&B's Credit Limit Recommendation**
D&B's industry and risk-based limit guidance
<u>Learn More</u>                     · <u>View Now</u>

**Payment Trends Profile**
Payment trends and industry benchmarks
· <u>Learn More</u>                     <u>View Now</u>

| | |
|---|---|
| **D-U-N-S Number:** | 03-907-5320 |
| **D&B Rating:** | **ER3** |
| **Number of employees:** | ER3 is **100 to 499** employees. |

**D&B PAYDEX®:**

**12-Month D&B PAYDEX: 80**
When weighted by dollar amount, payments to suppliers average generally within terms.

| 0 | | ▽ | 100 |
|---|---|---|---|
| 120 days slow | 30 days slow | Prompt | Anticipates |

Based on trade collected over last 12 months.

NEW! <u>Enhanced payment trends and industry benchmarks are available on this business</u>

**SUMMARY ANALYSIS**

**D&B Rating:**          **ER3**
   **Number of employees:** ER3 indicates **100 to 499** employees.

Certain lines of business, primarily banks, insurance companies and government entities, do not lend themselves to classification under the D&B Rating system. Instead, we assign these types of businesses an Employee Range symbol based on the number of people employed. No other significance should be attached to this symbol. The ERN should not be interpreted negatively. It simply means we do not have information indicating how many people are employed at this firm. For more information, see the D&B Rating Key.

Below is an overview of the company's rating history since 01/01/91:

| D&B Rating | Date Applied |
|------------|--------------|
| ER3 | 09/07/00 |
| ER4 | 05/21/94 |
| ER3 | 07/23/93 |
| ER4 | 12/10/92 |
| ER3 | 06/10/92 |
| ER4 | 01/01/91 |

The Summary Analysis section reflects information in D&B's file as of May 12, 2008.

| **NEW!** How does **AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY**'s payment record compare to its industry? ⑦ |
|---|
| A Payment Trends Profile will show you - <u>View Now</u> |

**CUSTOMER SERVICE**

If you have questions about this report, please call our Customer Resource Center at 1.800.234.3867 from anywhere within the U.S. If you are outside the U.S. contact your local D&B office.

*** Additional Decision Support Available ***

Additional D&B products, monitoring services and specialized investigations are available to help you evaluate this company or its industry. Call Dun & Bradstreet's Customer Resource Center at 1.800.234.3867 from anywhere within the U.S. or visit our website at www.dnb.com.

**HISTORY**

The following information was reported **02/02/2008**:

**Officer(s):**    ROBERT A NELSON, PRES

**DIRECTOR(S):**    The officers identified by (+) and Robert Allen Adams, Gary Gruber and S Craig Lindner.

Business started 1977 by the parent company. 100% of capital stock is owned by the parent company.

ROBERT A NELSON. Active here over 15 years.

**RELATED COMPANIES:**
Through common financial interest and/or management, subject is related to numerous sister subsidiaries of Great American Insurance Company (Inc), the bulk of which are active in various insurance-related activities. Several of the more significant sister subsidiaries are identified as follows.

Agricultural Insurance Company (Inc), Cincinnati, OH. Started 1973. DUNS #060121100. Agricultural insurance underwriter.

American Alliance Insurance Company (Inc), Cincinnati, OH. Started 1973. DUNS #099863714. Casualty insurance underwriter.

Full extent of intercompany relations unavailable.

Business address has changed from 515 Main St Ste 300, Cincinnati, OH, 45202 to 580 Walnut St, Cincinnati, OH, 45202.

**CORPORATE FAMILY**

Click below to buy a Business Information Report on that family member.
For an expanded, more current corporate family view, use D&B's Global Family Linkage product.

| Buy Selected Report(s) |
|---|

D&B Business Information Report: AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY   Page 3 of 7

**Domestic Ultimate:**

| | | |
|---|---|---|
| American Financial Group, Inc. | Cincinnati, OH | DUNS # 79-993-9913 |

**Parent:**

| | | |
|---|---|---|
| Great American Insurance Co | Cincinnati, OH | DUNS # 05-735-6909 |

**Subsidiaries (US):**

| | | |
|---|---|---|
| American Empire Insurance Co | Cincinnati, OH | DUNS # 60-708-5339 |
| Specialty Underwriters Inc | Houston, TX | DUNS # 09-194-6004 |

**Affiliates (US):** *(Affiliated companies share the same parent company as this business.)*

| | | |
|---|---|---|
| American Alliance Insurance Company | Cincinnati, OH | DUNS # 09-986-3714 |
| American National Fire Insurance Co | Cincinnati, OH | DUNS # 06-010-3389 |
| American Spirit Insurance Company | Cincinnati, OH | DUNS # 60-710-4361 |
| Brothers Property Corporation | Coral Gables, FL | DUNS # 15-296-8236 |
| Dempsey & Siders Insur Agcy Inc | Cincinnati, OH | DUNS # 06-894-9569 |
| Fcia Management Company, Inc. | New York, NY | DUNS # 85-846-9950 |
| Great American Assurance | Cincinnati, OH | DUNS # 06-012-1100 |
| Great American Custom Insurance | Chicago, IL | DUNS # 79-693-7548 |
| Great American Custom Insurance Services, Inc | Los Angeles, CA | DUNS # 04-878-0444 |
| Great American E & S Insurance Company | Cincinnati, OH | DUNS # 06-006-9952 |
| Great American Lloyd's Insurance Company | Richardson, TX | DUNS # 78-771-7529 |
| Great American Management Services, Inc | Cincinnati, OH | DUNS # 07-017-4958 |
| Great American Security Insurance Company | Cincinnati, OH | DUNS # 60-674-6121 |
| Great American-Midwest Inc | Cincinnati, OH | DUNS # 18-576-6003 |
| Grizzly Golf Center Inc. | Mason, OH | DUNS # 03-095-5538 |
| Mid-Continent Casualty Company | Tulsa, OK | DUNS # 00-790-7678 |
| National Interstate Corporation | Richfield, OH | DUNS # 62-607-6707 |
| Premier Dealer Services, Inc. | San Diego, CA | DUNS # 85-860-1271 |

**Affiliates (International):** *(Affiliated companies share the same parent company as this business.)*

| | | |
|---|---|---|
| El Aguila Compañía de Seguros, S.A de C.V | CIUDAD DE MEXICO, MEXICO | DUNS # 81-229-4254 |
| PENN CENTRAL U K LTD | London, UK (ENGLAND, SCOTLAND, WALES, N.IRELAND) | DUNS # 23-700-0369 |

[ Buy Selected Report(s) ]

BUSINESS REGISTRATION

CORPORATE AND BUSINESS REGISTRATIONS PROVIDED BY MANAGEMENT OR OTHER SOURCE

The Corporate Details provided below may have been submitted by the management of the subject business and may not have been verified with the government agency which records such data.

**Registered Name:**    American Empire Surplus Lines Insurance Company (Inc)

| | | | |
|---|---|---|---|
| **Business type:** | CORPORATION | **Common stock** | |
| **Corporation type:** | PROFIT | Authorized shares: | 10,000 |
| **Date incorporated:** | JUL 15 1977 | Par value: | NO PAR VALUE |

**State of incorporation:**   DELAWARE

**Where filed:**   Secretary of State, Dover, DE

OPERATIONS

02/02/2008

**Description:** Subsidiary of GREAT AMERICAN INSURANCE COMPANY (INC), CINCINNATI, OH started 1973 which operates as property and casualty insurance company. Parent company owns 100% of capital stock. Parent company has numerous other subsidiary(ies). Intercompany relations: Management reports that intercompany relation consist of occasional unsecured loans and advances.

As noted, this company is a subsidiary of Great American Insurance Company (Inc), DUNS number 057356909, and reference is made to that report for background information on the parent company and its management. The company has submitted the following figures dated Dec 31, 1997: Total Assets: $4,285,223,742; Total Equity: $1,354,215,789; Total Revenues: $1,286,405,025: Net Income: $122,633,464.

Subject's ultimate parent company is identified as American Financial Corporation, Cincinnati, OH. DUNS # 006999064. Started 1955. Active as a diversified stock holding company. American Financial Corporation has submitted the following consolidated figures dated Dec 31 1997: Total Assets $15,737,982,000; Total Equity $572,177,000; Total Revenues $4,052,902,000 and Net Income $201,390,000.

Property, casualty and surplus lines insurance carrier (100%).

Terms are net 45 days. Sells to commercial accounts. Territory : Local.

Nonseasonal.

**Employees:** 112 which includes officer(s). 57 employed here.

**Facilities:** Rents 33,000 sq. ft. in a multi story brick building. Occupies second, third and fourth floors.

**Location:** Central business section on main street.

**Subsidiaries:** This business has 4 subsidiaries listed below.

The extent of ownership where known, is shown in parenthesis following company name:

American Empire Insurance Company (Inc), Cincinnati, OH. (100%) chartered 1979. Operates as a stock casualty and property damage insurance underwriter. DUNS #60-708-5339.

Fidelity Excess and Surplus Insurance Co, Inc, Cincinnati, OH. (100%). Chartered 1987, under present control since 1991. DUNS #360684005. Stock casualty and property damage insurance underwriter.

American Signature Underwriting Inc, Cincinnati, OH. Operates as an insurance agency.

Specialty Underwriting Inc, Cincinnati, OH. Operates as an insurance agency.

Intercompany relations, as reported by management, consist of intercompany pooling of loss agreements, premiums and certain expenses.

SIC & NAICS

**SIC:**
Based on information in our file, D&B has assigned this company an extended 8-digit SIC. D&B's use of 8-digit SICs enables us to be more specific to a company's operations than if we use the standard 4-digit code.

The 4-digit SIC numbers link to the description on the Occupational Safety & Health Administration (OSHA) Web site. Links open in a new browser window.

63310203     Fire, marine, and casualty insurance:

**NAICS:**

| | |
|---|---|
| 524126 | Direct Property and Casualty Insurance Carriers |
| 524126 | Direct Property and Casualty Insurance Carriers |

D&B Business Information Report: AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY   Page 5 of 7

| 63319907 | stock<br>Property damage Insurance |
|---|---|

### D&B PAYDEX

**NEW!** Enhanced payment trends and industry benchmarks are available on this business

The D&B PAYDEX is a unique, dollar weighted indicator of payment performance based on up to 11 payment experiences as reported to D&B by trade references.



**3-Month D&B PAYDEX: 80**
When weighted by dollar amount, payments to suppliers average within terms.

Based on trade collected over last 3 months.



**12-Month D&B PAYDEX: 80**
When weighted by dollar amount, payments to suppliers average generally within terms.

Based on trade collected over last 12 months.

When dollar amounts are not considered, then approximately 100% of the company's payments are within terms.

### PAYMENT SUMMARY

The Payment Summary section reflects payment information in D&B's file as of the date of this report.

Below is an overview of the company's dollar-weighted payments, segmented by its suppliers' primary Industries:

| | Total Rcv'd (#) | Total Dollar Amts ($) | Largest High Credit ($) | Within Terms (%) | Days Slow <31 | 31-60 | 61-90 | 90> (%) |
|---|---|---|---|---|---|---|---|---|
| **Top industries:** | | | | | | | | |
| Reg misc coml sector | 2 | 600 | 500 | 100 | - | - | - | - |
| Air courier service | 2 | 350 | 250 | 100 | - | - | - | - |
| Photocopying service | 1 | 5,000 | 5,000 | 100 | - | - | - | - |
| Whol office supplies | 1 | 2,500 | 2,500 | 100 | - | - | - | - |
| Whol office equipment | 1 | 500 | 500 | 100 | - | - | - | - |
| Public finance | 1 | 500 | 500 | 100 | - | - | - | - |
| Telephone communictns | 1 | 50 | 50 | 100 | - | - | - | - |
| Whol industrial equip | 1 | 50 | 50 | 100 | - | - | - | - |
| **Other payment categories:** | | | | | | | | |
| Cash experiences | 1 | 0 | 0 | | | | | |
| Payment record unknown | 0 | 0 | 0 | | | | | |
| Unfavorable comments | 0 | 0 | 0 | | | | | |
| **Placed for collections:** | | | | | | | | |
| With D&B | 0 | 0 | | | | | | |
| Other | 0 | N/A | | | | | | |
| Total In D&B's file | 11 | 9,550 | 5,000 | | | | | |

The highest **Now Owes** on file is $5,000

The highest **Past Due** on file is $0

D&B receives over 600 million payment experiences each year. We enter these new andupdated experiences into D&B Reports as this information isreceived.

D&B Business Information Report: AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY   Page 6 of 7

| NEW! How does AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY's payment record compare to its industry? | ⑦ |
|---|---|
| A Payment Trends Profile will show you - View Now | |

## PAYMENT DETAILS

### Detailed Payment History

| Date Reported (mm/yy) | Paying Record | High Credit ($) | Now Owes ($) | Past Due ($) | Selling Terms | Last Sale Within (months) |
|---|---|---|---|---|---|---|
| 04/08 | Ppt | 500 | 0 | 0 | | 4-5 mos |
| | Ppt | 250 | 100 | 0 | | 1 mo |
| | Ppt | 100 | 50 | 0 | | 1 mo |
| | Ppt | 50 | 0 | 0 | N30 | 4-5 mos |
| 03/08 | Ppt | 5,000 | 5,000 | | | 1 mo |
| | (006) | 0 | | | Sales COD | 2-3 mos |
| 12/07 | Ppt | 100 | | | | 1 mo |
| 10/07 | Ppt | 500 | | | | 1 mo |
| 09/07 | Ppt | 500 | | | | 1 mo |
| 01/07 | Ppt | 50 | 0 | 0 | | 6-12 mos |
| 07/06 | Ppt | 2,500 | 1,000 | 0 | N30 | 1 mo |

Each experience shown is from a separate supplier. Updated trade experiences replace those previously reported.

| NEW! Have AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY's payment habits changed over time? | ⑦ |
|---|---|
| A Payment Trends Profile will show you - View Now | |

## FINANCE

02/02/2008

Two-year statement comparative:

| | Fiscal Dec 31 1995 | Fiscal Dec 31 1997 |
|---|---|---|
| Total Assets | 302,176,807 | 283,636,509 |
| Total Liabilities | 194,247,545 | 172,090,616 |
| Net Worth | 107,929,262 | 111,545,893 |
| Revenue | 32,833,489 | 23,020,619 |
| Net Profit (Loss) | 5,654,470 | 24,168,603 |

The name and address of this business have been confirmed by D&B using available sources.

## PUBLIC FILINGS

The following Public Filing data is for information purposes only and is not the official record. Certified copies can only be obtained from the official source.

## SUITS

**Suit amount:**          **$3,200,000**

D&B Business Information Report: AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY    Page 7 of 7

| | |
|---|---|
| **Status:** | **Pending** |
| **DOCKET NO.:** | 06CV08853 |
| **Plaintiff:** | COUNTRYWOODS PARTNERS LLC |
| **Defendant:** | AMERICAN EMPIRE SURPLUS LINES INSURANCE CO |
| **Where filed:** | MONTGOMERY COUNTY COMMON PLEAS COURT, DAYTON, OH |
| | |
| **Date status attained:** | 11/08/2006 |
| **Date filed:** | 11/08/2006 |
| **Latest Info Received:** | 12/06/2006 |

If it is indicated that there are defendants other than the report subject, the lawsuit may be an action to clear title to property and does not necessarily imply a claim for money against the subject.

The public record items contained in this report may have been paid, terminated, vacated or released prior to the date this report was printed.

Copyright 2008 Dun & Bradstreet - Provided under contract for the exclusive use of subscriber 065007804L

# Exhibit D

Not Reported in F.Supp.2d                                                           Page 1
Not Reported in F.Supp.2d, 2003 WL 23518380 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23518380 (N.D.Ill.))**

C

Childress v. Ford Motor Co.

N.D.Ill.,2003.

Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois, Eastern Division.

Sherry G. CHILDRESS and George J. Childress, Plaintiffs,

v.

FORD MOTOR COMPANY, a corporation, Defendant.

**No. 03C3656.**

Dec. 17, 2003.

Robert A. Clifford, Richard Francis Burke, Jr., Clifford Law Offices, P.C., Chicago, IL, George S. Bellas, Bellas & Wachowski, Park Ridge, IL, for Plaintiffs.

Thomas P Branigan, Bowman & Brooke Law Firm, Troy, MI, John Augustine Krivicich, James Daniel Sloan, Donohue, Brown, Mathewson & Smyth, Chicago, IL, for Defendant.

*MEMORANDUM AND ORDER*

LINDBERG, J.

*\*1 On March 4, 2003, Plaintiffs Sherry G. Childress and George J. Childress filed an action in the Circuit Court of Cook County, Illinois against Defendant Ford Motor Company. Plaintiffs' complaint included both product liability and negligence claims arising out of an automobile accident that occurred near Jasper, Missouri. In turn, Defendant filed a notice of removal on May 29, 2003, and the case was subsequently removed to this Court. Defendant has now filed a motion to transfer venue pursuant to 28 U.S.C. § 1404(a). Defendant's motion seeks entry of an order transferring Case No. 03 C 3656 to the United States District Court for the Western District of Missouri. For the following reasons, Defendant's motion is granted.*

*Opinion*

28 U.S.C. § 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). It is well-established that "a court may transfer a civil action to another district when: (1) venue is proper in both the transferor and transferee courts; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interest of justice." *Chukwu v. Air France,* 218 F.Supp.2d 979, 988 (N.D.Ill.2002) (citation omitted); *Heller Fin., Inc. v. Ohio Sav. Bank,* 158 F.Supp.2d 825, 830 n. 2 (N.D.Ill.2001). The evaluation and weighing of these factors are matters committed to this Court's sound discretion. *See Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 219 (7th Cir.1986); *Bryant v. ITT Corp. .,* 48 F.Supp.2d 829, 832 (N.D.Ill.1999).

**I. Venue is Proper in Both the Northern District of Illinois and Western District of Missouri**

28 U.S.C. § 1391(a) provides, in pertinent part, that

[a] civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides ..., (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ..., or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a). Moreover, § 1391(c) states that "[f]or purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c).

**A. Northern District of Illinois**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Case 1:08-cv-02799     Document 5-5     Filed 05/16/2008     Page 3 of 40     Page 2

Not Reported in F.Supp.2d, 2003 WL 23518380 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23518380 (N.D.Ill.))**

Defendant concedes in its memorandum that it is subject to personal jurisdiction in Illinois. ("Ford does not deny that it is subject to personal jurisdiction in Illinois.") Therefore, venue is proper in the Northern District of Illinois. *See* 28 U.S.C. § 1391(a), (c). This conclusion is not contested by Plaintiffs.

### B. Western District of Missouri

*2 Venue is also proper in the Western District of Missouri. It is clear from Plaintiffs' complaint that "a substantial part of the events or omissions giving rise to [Plaintiffs' state-law claims] occurred" in the Western District of Missouri. Both Plaintiffs and Defendant concede as much in their briefs.

Furthermore, Defendant is subject to the personal jurisdiction of that District. Defendant apparently concedes jurisdiction in Missouri, as it seeks to transfer the case to that district. Perhaps even more telling, Defendant's memorandum unequivocally states that "Missouri is the proper venue for trial of this matter as the accident occurred there, and Ford does business there." A review of the facts in this case in light of the obvious realities concerning Defendant's business practices leads to the conclusion that Defendant is subject to personal jurisdiction in Missouri. This conclusion is supported by case law. *See, e.g., Sales Serv. Inc. v. Daewoo Int'l (Am.) Corp.,* 719 F.2d 971, 972 (8th Cir.1983) ("In order to subject [a non-resident corporation] to the personal jurisdiction of the Missouri courts, [that corporation's] contacts with the forum state must satisfy the requirements of Missouri's long-arm statute and the due process requirement of 'minimum contacts." ') (citations omitted); *Divine/ Whittman-Hart, Inc. v. King,* No. 02-2486, 2002 WL 1611585, at *4 (N.D.Ill. July 22, 2002) (collecting cases discussing federal due process standards); *Missouri ex rel. Nixon v. Beer Nuts, Ltd.,* 29 S.W.3d 828, 834 (Mo.Ct.App.2000) ("a corporation subjects itself to legal action in the State of Missouri if it transacts any business within the State or enters into a contract within the State")

(citation omitted). Because neither party disputes this conclusion (or even addresses it for that matter), this Court finds that venue in the Western District of Missouri is proper under § 1391.

### II. Transfer is for the Convenience of the Parties and Witnesses

When evaluating the convenience of the parties and witnesses, this Court considers: "(1) the plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience to the parties of litigating in the respective forums." *Allied Van Lines, Inc. v. Aaron Transfer & Storage, Inc.,* 200 F.Supp.2d 941, 946 (N.D.Ill.2002) (citation omitted); *Millennium Prods. Inc. v. Gravity Boarding Co.,* 127 F.Supp.2d 974, 980 (N.D.Ill.2000). The Court will also take into account the parties' residences. *Moore v. AT & T Latin Am. Corp.,* 177 F.Supp.2d 785, 789 (N.D.Ill.2001) (citation omitted). With respect to its transfer motion, Defendant bears the burden of establishing that the Western District of Missouri is the more convenient forum. *See Allied,* 200 F.Supp.2d at 946; *Gravity,* 127 F.Supp.2d at 980. Here, Defendant has satisfied its burden.

### A. Plaintiffs' Choice of Forum and Situs of Material Events

*3 Generally, a plaintiff's choice of forum carries "substantial weight ..., particularly where it is also the plaintiff's home forum." *Clear Channel Outdoor, Inc. v. Rubloff Oakridge Algonquin, L.L.C.,* No. 03-3063, 2003 WL 22382999, at *3 (N.D.Ill. Oct.16, 2003) (citation and internal quotation marks omitted). However, the deference afforded the plaintiff's choice is minimized where the plaintiff does not reside in her chosen forum. *See H.B. Sherman Mfg. Co. v. Rain Bird Nat'l Sales Corp.,* 979 F.Supp. 627, 630 (N.D.Ill.1997) ("Where ... the plaintiff is not a resident of the forum district, this factor is given no additional weight and is merely

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-02799     Document 5-5     Filed 05/16/2008     Page 4 of 40

Not Reported in F.Supp.2d                                                                        Page 3
Not Reported in F.Supp.2d, 2003 WL 23518380 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23518380 (N.D.Ill.))**

another factor to consider along with the others.") (citation omitted); *Hess v. Gray,* 85 F.R.D. 15, 24 (N.D.Ill.1979). This deference is further minimized "where the plaintiff's choice of forum is not the site of material events...."*Friskit, Inc. v. Realnetworks, Inc.,* No. 03-4505, 2003 WL 22433106, at *1 (N.D.Ill. Oct.24, 2003) (citation omitted); *Boyd v. Snyder,* 44 F.Supp.2d 966, 970 (N.D.Ill.1999) ("When the conduct and events giving rise to the cause of action did not take place in the plaintiff's selected forum, the plaintiff's preference has minimal value even if it is his home forum.") (citations and internal quotation marks omitted).

Here, Plaintiffs concede that they resided in Indiana both at the time of the automobile accident and at the time the suit was filed. Therefore, the Northern District of Illinois is not their home forum. That fact belies Plaintiffs' argument that their choice of forum must be afforded substantial deference. Moreover, both parties acknowledge that the accident occurred in Missouri and, therefore, the "site of material events" lies in Missouri. This fact further minimizes the deference afforded to Plaintiffs' choice of forum. When weighed against the factors discussed below, the deference afforded Plaintiffs' choice of forum under the present circumstances is insufficient to justify adjudicating the case in this Court.

B. Relative Ease of Access to Sources of Proof and Convenience of Witnesses

Because the automobile accident at issue occurred in Missouri, almost all of the material witnesses concerning liability reside in Missouri. Indeed, the attending law enforcement officers, towing personnel, medical and emergency personnel, and one of two eyewitnesses to the accident (notably, the only eyewitness not related to Plaintiffs) all reside in Missouri. Although it may be possible to secure the testimony of these witnesses through the use of depositions, live testimony is greatly preferred. *Household Fin. Servs., Inc. v. Prestige Fin. Servs. Corp.,* No. 99-1756, 1999 WL 608705, at *2 n. 8

(N.D.Ill. Aug.6, 1999) ("Live witness testimony is superior to either printed or taped depositions."); *Sky Valley Ltd. P'ship v. ATX Sky Valley, Ltd.,* 776 F.Supp. 1271, 1277 (N.D.Ill.1991) ("The interest of justice is better served by ensuring the presence of live witness testimony. It is well settled that the trier of fact should not be forced to rely on deposition evidence when the deponent's live testimony can be procured.") (citations and internal quotation marks omitted). This preference deserves additional emphasis in this case due to the parties' disputes concerning material issues of fact, such as (1) the state of Plaintiff Sherry G. Childress at the time of the accident and (2) whether the occupants of the vehicle were wearing seatbelts. Unfortunately, live testimony from the third-party Missouri witnesses could not be ensured if the action were to remain in Illinois because those witnesses are outside the subpoena power of this Court.[FN1] *See*Fed.R.Civ.P. 45. This fact cuts heavily in favor of transfer. *See Sky Valley,* 776 F.Supp. at 1277.

> FN1. The fact that a witness outside of this Court's subpoena power, Frank Lenati, has purportedly agreed to travel to this District to testify is of little consequence because the Court has not received any guarantee that he will actually do so.

*4 Although Plaintiffs indicate that they will call Indiana resident Mary Childress to testify about the automobile accident and the injuries sustained therefrom, it is reasonable to conclude that Childress, Plaintiffs' daughter, is more likely to attend trial than the non-party Missouri witnesses who are neither blood relatives of Plaintiffs or employees of Defendant. *See, e.g., American Family Ins. v. Wal-Mart Stores, Inc.,* No. 02-8017, 2003 WL 1895390, at *2 (N.D.Ill. Apr.17, 2003) ("As a practical matter, it is usually assumed that witnesses within the control of the parties will appear voluntarily. Therefore, more attention should be given to the location of the non-party witnesses and those witnesses not within the control of the parties.") (citation omitted). Additionally, the Court is not persuaded that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23518380 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 23518380 (N.D.Ill.))

Page 4

the non-party, rehabilitative care physicians and therapists that Plaintiffs intend to call as witnesses are likely to provide material testimony on liability issues. Plaintiffs' response brief suggests as much. ("Additionally, many of the Plaintiffs' primary treating physicians (who most likely will have opinions on permanency) are those from ... within the Northern District of Illinois.") Indeed, none of these witnesses were present at or near the time of (1) the accident or (2) initial treatment for the resulting injuries. Even though these witnesses reside in Illinois and, therefore, appear to be outside of the Western District of Missouri's subpoena power, this Court will lean in favor of ensuring live testimony from the witnesses who can testify about the automobile accident itself and the events and acts following shortly thereafter. At least one other Northern District of Illinois court has ruled in similar fashion. *See Van Horn v. Graves,* No. 01-5186, 2002 WL 27658, at *2 (N.D.Ill. Jan.10, 2002) ("[Plaintiff] argues ... that a larger number of witnesses related to the proof of damages are in Illinois....However, [Plaintiff] fails to acknowledge that in order to present proof of damages there must first be a determination of liability."); *see also True v. Uniroyal, Inc.,* No. 91-6169, 1992 WL 13199, at *2 (N.D.Ill. Jan.23, 1992).

In light of the significant testimony that will be provided by the non-party Missouri witnesses, it is important to consider which forum will be more convenient for those individuals. *Moore,* 177 F.Supp.2d at 790 ("One key witness for one party can outweigh many less important witnesses for the other party.") (citation and internal quotation marks omitted). Plaintiffs present no facts to suggest that it will be more convenient for the non-party Missouri witnesses to appear in this District as opposed to the Western District of Missouri. Because the Western District of Missouri is significantly closer to their residences and places of employment, it is only natural to conclude that it will be much more convenient (*e.g.,* less expensive and less of an intrusion on the witnesses' time) for those witnesses to appear there as opposed to here. FN2

FN2. Plaintiffs cite to *Peterson v. United States Steel Corp.,* 624 F.Supp. 44 (N.D.Ill.1985) to bolster their arguments. However, *Peterson* may be distinguished. In that case, the court considered a motion to transfer the case from the Northern District of Illinois to the Northern District of Indiana. *Id.* at 45. Although the court denied the motion, it noted that " § 1404(a) should not be invoked for transfer between courts separated by a short and easily traveled distance since the intent of the statute was to eliminate the real inconvenience which may accrue to parties and witnesses residing a substantial distance from the district where the action is brought." *Id.* at 46 (citations omitted). The instant action presents the very circumstances that the *Peterson* court stated § 1404(a) was designed to guard against.

*5 Finally, any documentary evidence concerning the accident and the medical treatment administered on-scene and shortly thereafter exists in Missouri. Such information could be easily obtained by the parties under the auspices of the Western District of Missouri. More importantly, Plaintiffs present no argument that the parties would be in any better position to obtain access to these documents if the case were to remain in this District.

For all of the above reasons, this Court finds that considerations concerning the relative ease of access to sources of proof and the convenience of the witnesses also weigh heavily in favor of transfer.

C. Parties' Residences and Convenience to the Parties of Litigating in the Respective Forums

While the Court has little doubt that Plaintiffs' and their counsel would much prefer to litigate this case here in the Northern District of Illinois, that desire does not outweigh the myriad of reasons to transfer the case. None of the parties to this suit reside within the Northern District of Illinois. Whether the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23518380 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 23518380 (N.D.Ill.))

case remains here or is transferred, both parties will be forced to litigate the case outside of their "home" jurisdictions. Moreover, neither party has presented any facts to suggest that it will be to Defendant's advantage to litigate the case in the Western District of Missouri. To that end, the Court does not find that transfer is designed to shift any burdens imposed on Defendant to Plaintiffs.

Plaintiffs' response brief provides evidence that Plaintiffs' counsel is more than equipped to litigate this case in the transferee district. For example, Plaintiffs indicate their willingness to retain experts and consultants from across the country to testify and provide analysis to support Plaintiffs' claims. Additionally, no effort was made to quantify any financial burden that would be placed upon either Plaintiffs or their counsel should the case be transferred. While the Court sympathizes with Plaintiffs' desire to keep the case closer to Indiana in light of the injuries suffered in connection with the accident, that fact alone does not overcome the overwhelming arguments in favor of transfer.

### III. Transfer is in the Interest of Justice

An analysis of the interest of justice "primarily relates to the efficient functioning of the courts." *RBC Mortgage Co. v. Couch,* 274 F.Supp.2d 965, 971 (N.D.Ill.2003) (citation omitted). Factors that may be considered include: "(1) the speed at which the case will proceed to trial; (2) the court's familiarity with the applicable law; (3) the desirability of resolving controversies in each locale; and (4) the relation of each community to the occurrence at issue." *Allied,* 200 F.Supp.2d at 946 (citation omitted); *Bryant,* 48 F.Supp.2d at 834. With respect to Defendant's motion, the above-listed factors weigh heavily in favor of transfer.

### A. Speed at Which Case Will Proceed to Trial

Plaintiffs offer no facts to suggest that resolution of this case will be substantially delayed if the case is transferred to the Western District of Missouri. In fact, Defendant offers statistical evidence that suggests Plaintiffs may actually have their claims tried faster if the case were to be transferred. This factor, therefore, cuts in favor of transfer.

### B. Familiarity with the Applicable Law

*6 This court takes no position as to which state's law should be applied in resolving Plaintiffs' claims. Given the overwhelming number of factors weighing in favor of transfer, there is no need to address this issue at this time. Nevertheless, it goes without saying that the Court is confident in the Western District of Missouri's ability to apply the appropriate state law in adjudicating Plaintiffs' claims.

### C. Desirability of Having Case Resolved in Western District of Missouri and Relation of Western District of Missouri to Occurrence at Issue

It is clearly more desirable to have this case resolved in the Western District of Missouri. The automobile accident, injuries, and most of the material events at issue occurred entirely within the Western District of Missouri. Because this controversy arises therein, it follows that the Western District of Missouri and the citizens of Missouri have a compelling interest in resolving the matter. *See also Technical Concepts L.P. v. Zurn Indus., Inc.,* No. 02-5150, 2002 WL 31433408, at *7 (N.D.Ill. Oct.31, 2002) ("Resolving litigated controversies in their locale is a desirable goal of the federal courts.") (citation and internal quotation marks omitted); *Doage v. Bd. of Regents,* 950 F.Supp. 258, 262 (N.D.Ill.1997). Moreover, it is irrelevant that Ford transacts business in this District. No argument was presented to support any finding that Ford's business outside of Missouri in any way impacts the resolution of this case. In fact, the vehicle was neither manufactured in Illinois nor purchased in Illinois. Accordingly, this factor cuts heavily in favor of transfer.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23518380 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 23518380 (N.D.Ill.))**

*Conclusion*

When weighed against the deference owed to Plaintiffs' choice of forum and Plaintiffs' other arguments to support adjudicating this action in the Northern District of Illinois, the multitude of factors identified and evaluated by this Court clearly and overwhelmingly favor transfer. Accordingly, Case No. 03 C 3656 should be transferred to the Western District of Missouri.

ORDERED: Defendant's Motion to Transfer Venue [5] is granted. The Court orders Case No. 03 C 3656 transferred to the ·Western District of Missouri.

N.D.Ill.,2003.
Childress v. Ford Motor Co.
Not Reported in F.Supp.2d, 2003 WL 23518380 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2007 WL 2874216 (N.D.Ill.)
**(Cite as: 2007 WL 2874216 (N.D.Ill.))**

**c**

Suarez v. Kwoks Intern. Trading, Inc.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
    United States District Court,N.D. Illinois,Eastern
                        Division.
            Richard SUAREZ, Plaintiff,
                          v.
    KWOKS INTERNATIONAL TRADING, INC., d/
        b/a Kwok's Food Service, Defendant.
                   **No. 05 C 6979.**

                    Sept. 25, 2007.

Marshall J. Burt, Law Offices of Marshall J. Burt,
Andrew Jay Cohen, Law Offices of Andrew J. Co-
hen, Chicago, IL, for Plaintiff.
Ronald Barry Schwartz, Stanley Eisenstein, Katz
Friedman Eagle Eisenstein, Johnson & Bareck,
Chicago, IL, for Defendant.

            *MEMORANDUM OPINION AND ORDER*

REBECCA R. PALLMEYER, United States Dis-
trict Judge.
**\*1** Plaintiff Richard Suarez, an Hispanic man born
in Mexico, worked for Defendant Kwoks Interna-
tional Trading Inc. (hereinafter "Kwok's") from
June 2002 until May 2003, when Kwok's termin-
ated his employment. Suarez sued Kwok's under
Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000e *et seq.,* alleging that the company discrim-
inated against him by paying him inadequately, by
creating a hostile work environment, and by termin-
ating him on the basis of his Hispanic status and in
retaliation for his complaints about prior discrimin-
ation.

Kwok's now moves for summary judgment on all of
Suarez's claims. Suarez moves to strike portions of
Kwok's Reply in Support of Its Motion for Sum-
mary Judgment and its Response to Plaintiff's Addi-
tional Statements of Fact. For the reasons stated be-
low, this court grants summary judgment in favor

of Kwok's on the pay discrimination claim, denies
summary judgment on Suarez's other claims, and
denies Suarez's motions to strike.

            *FACTUAL BACKGROUND*[FN1]

    FN1. The facts below are drawn from the
    parties' Local Rule 56.1 statements and at-
    tachments. Defendant's Statement of Ma-
    terial Facts in Support of its Motion for
    Summary Judgment will be cited here as
    "Def.'s LR 56.1 Stmt.," and Defendant's
    Memorandum in Support of Defendant's
    Motion for Summary Judgment will be
    cited as "Def.'s Mem." The portion of
    Plaintiff's Rule 56.1(b)(3) Response to De-
    fendant's Statement of Material Facts and
    Additional Facts Warranting Denial of
    Summary Judgment that responds to
    Kwok's Local Rule 56.1 Statement will be
    cited here as "Pl.'s LR 56.1 Resp.," and the
    portion that introduces new facts will be
    cited as "Pl's LR 56.1 Stmt." Plaintiff's Re-
    sponse to Defendant's Motion for Sum-
    mary Judgment will be cited as "Pl.'s
    Resp." The Defendant's Local Rule 56.1(a)
    Response to Plaintiff's Statement of Addi-
    tional Facts will be cited here as "Def.'s
    LR 56.1 Resp." Volume II of Suarez's Ap-
    pendix Submitted in Opposition to Motion
    for Summary Judgment, which contains his
    documentary exhibits, will be cited as
    "Pl.'s App," except that Exhibit Two of
    Suarez's Appendix, which is a letter sup-
    plementing his answers to interrogatories
    and his required disclosures, will be cited
    as "Pl.'s Supp."

The facts are recounted in the light most favorable
to Suarez, the non-movant on this motion for sum-
mary judgment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### Kwok's Owners and Managers

Kwoks International Trading, Inc., d/b/a Kwok's Food Service, was an Illinois corporation, dissolved in August of 2004, that was in the business of selling meats and poultry at wholesale. (Pl.'s LR 56.1 Resp. ¶ 2.) In June 2002, Kwok's hired Suarez, who is of Mexican national origin, as a sales representative, in an effort to tap into Suaraz's prior experience selling meat to Hispanicowned businesses. (*Id.* ¶¶ 1, 11, 13.)At the time he was hired, Suarez had more than thirty years of experience in the meat industry, (*id.* ¶ 6), and was friendly with two of Kwok's owners, Peter Ng and Christine Chun.(*Id.* ¶¶ 7-9.)

Peter Ng oversaw all aspects of Kwok's business and also personally purchased and sold meat. (Def.'s LR 56.1 Resp. ¶ 3.) Christine Chun, also a manager of Kwok's, was responsible for office administration and human resources functions, including hiring. (*Id.* ¶ 2.) Charlie Chun, Christine Chun's younger brother, was the Sales and Operations Manager of Kwok's; he had the power to hire and fire employees. (*Id.* ¶¶ 1-2; Ng Dep. 16:22-17:7.) Louis Ng's role at Kwok's is disputed, but Suarez notes that in its response to his EEOC charge, Kwok's successor admitted Louis Ng was a manager and owner of Kwok's. (EEOC Charge of Discrimination, Pl's App. Ex. 1, DEF0107 ¶ 4; Charles Austin Limited's EEOC Response, Pl's App. Ex. 1, DEF0112 ¶ 4.) Louis Ng apparently exercised supervisory authority over workers in the shipping and receiving areas of the warehouse; Charlie Chun testified that Louis Ng "watched over the warehouse, the shipping and receiving" and "[made] sure that no one was doing something that they weren't supposed to [do]." (Charlie Chun Dep. 69:16-19.)

Peter Ng, Louis Ng, and Christine Chun are of Asian origin. (Answer to Am. Compl. ¶ 8.) Suarez asserts that apart from him, all the office staff at Kwok's were of Asian descent while he was employed there, (Suarez Dep. 48:10-12), and Kwok's has not denied this. (Def.'s LR 56.1 Resp. ¶ 6.) The parties agree that the "great majority" of Kwok's employees who worked "on the floor"-that is, in the warehouse and the area where chickens were deboned-were Hispanic, and that the majority of Kwok's employees worked on the floor. (Def.'s LR 56.1 Stmt. ¶¶ 46, 48; Pl.'s LR 56.1 Resp. ¶¶ 46, 48.) FN2

> FN2. Neither party has offered more specific data concerning the numbers of Asians, Hispanics and other employees working at Kwok's during the relevant period.

**\*2** Suarez's wages were $1,250 per week throughout the time of his employment at Kwok's. (Pl.'s LR 56.1 Resp. ¶ 15.) He contends that he was initially promised $1300 per week, but never received this amount. (Suarez Dep. 28:6-17.) Suarez contends that he was also promised a $20,000 year-end bonus, (*id.* at 30:4-6), but did not receive it. (Pl.'s LR 56.1 Resp. ¶ 16.) It is undisputed, however, that the amount of Suarez's compensation at Kwok's was based entirely on its business needs, and had nothing to do with his Hispanic status. (*Id.* at ¶ 20.)

### Plaintiff's Evidence of Harassment

Suarez testified that, while he worked at Kwok's, Peter Ng regularly referred to his Hispanic employees, including Suarez, as "chaquetons," a Spanish term which Suarez renders into English as "jagoff." (Suarez Dep. 62:22-63:9, 136:11-21; Pl.'s Supp. 2.) Peter Ng also regularly referred to both Suarez and other Hispanic employees as "stupid." (Suarez Dep. 136:15-21; Pl.'s Supp. 2.) This conduct continued into April of 2003, during which Suarez claims that Peter Ng called him "chaqueton" twice and "stupid" a few times. (Pl.'s Supp. 2.) Suarez further testified that Charlie Chun also regularly referred to Hispanic employees as "chaquetons." (Suarez Dep. 141:2-7.) Suarez estimates that Christine Chun overheard this language four to five times per month between January and April of 2003. (Pl.'s Supp. 2.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

According to Suarez, Louis Ng called Hispanic workers abusive names every day that he was at work. (Suarez Dep. 132:23-133:4.) He regularly called Suarez and other Hispanic workers "stupid Mexicans," (*id.* at 124:1-125:13), announced to the workers in the shipping department that "Mexicans are stupid," (*id.* at 162:21-24) and referred to Suarez using the terms "chaqueton" and "bendejo," which is a Spanish-language term for "asshole." (*Id.* at 129:1-7.)Louis Ng did not speak Spanish at work aside from these terms of abuse. (*Id.* at 125:21-22.)Christine Chun was present on at least five occasions when Louis Ng referred to Hispanic workers in the shipping department in a derogatory way.(*Id.* at 161:9-20.)Charlie Chun also witnessed Louis Ng making offensive comments to Hispanics at least once a week. (Charlie Chun Dep. 165:8-17.) Furthermore, Suarez contends, and Kwok's admits, that Louis Ng raised his voice at the Hispanic workers, and never did so towards the Asian employees. (Suarez Dep. 164:16-18; Def.'s LR 56.1 Resp. ¶ 16.)

Suarez testified that Christine Chun used the term "bendejos" very liberally with Hispanic employees at Kwok's, but never with non-Hispanic employees. (Suarez Dep. 192:15-20.) She called Suarez "bendejo" once in February, once in March, and three times in April of 2003. (Pl.'s Supp. 2.) She also frequently called him "stupid," including during April of 2003. (*Id.*)

Kwok's admits that neither Peter Ng, Christine Chun, nor Charlie Chun ever heard or uttered any negative comments towards the Asian employees of Kwok's. (Suarez Dep. 137:4-7, 140:5-7, 141:11-17; Def.'s LR 56.1 Resp. ¶ 16.) Suarez testified that, as a result of the harassment at Kwok's, he experienced emotional anguish, a loss of self-confidence and self-worth, and marital difficulties. (Suarez Dep. 147:10-22.)

*3 Suarez made a number of complaints regarding the work environment at Kwok's. He frequently asked Louis Ng to stop making derogatory comments about his race and national origin, to no

avail, although there is no record evidence as to when these complaints occurred. (Suarez Dep. 190:10-17.) He complained to Christine Chun about Louis Ng's behavior in late January or early February of 2003. (Pl.'s Supp. 1.) He also told both Christine Chun and Peter Ng that Louis Ng's behavior was so severe that it had caused Suarez's brother, Armando, to quit work at Kwok's, although he does not recall when this ooccurred. (Suarez Dep. 170:8-172:6, 184:23-186:20 .) Furthermore, he asked Christine Chun to stop calling him "stupid" and "bendejo" on two or three occasions, (*id.* at 191:7-17, 193:18-24, 195:1-11), including in March and April of 2003. (Pl.'s Supp. 2.)

### *Suarez's Termination*

In early May of 2003, Christine Chun cancelled service on Suarez's work cell phone, and instructed him to use his desk phone instead. (Suarez Dep. 50:5-52:12.) At the same time, Kwok's also suspended the use of a credit card Suaraz used for business expenses. (*Id.* at 50:4-5.)At that time, or soon afterwards, Suarez took the laptop computer purchased for him by Kwoks and went home. (Suarez Dep. 52:16-24.) He had perfect work attendance until that point and a good performance record. (*Id.* at 176-1-8; 187:19-188:6; Ng. Dep. 78:24-79:3)

Suarez did not return to work at Kwok's. The reason his employment ended is disputed. Peter Ng testified that Christine Chun said Suarez told her he was working from home, but would return soon, and that "nobody fire[d]" Suarez. (Ng. Dep. 56:3-6; 65:2-3.) Suarez claims that after he had been absent for Kwoks for more than two days, Christine Chun called him at home, told him that there was "no chemistry" between Suarez and the business, and told him, in effect, that he was fired. (Suarez Dep. 114:13-14; 187:6-18 .) Chun herself recalls that she first became aware that Suarez was not working from reports from Kwoks's customers. (Chun Dep. 79:15-82:2). She does not remember whether she had any conversations with Suarez after his departure. (*Id.* 82:14-19.)Kwoks nevertheless asserts that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2874216 (N.D.Ill.)
(Cite as: 2007 WL 2874216 (N.D.Ill.))

Page 4

it terminated Suarez's employment because he failed to return to work for more than two days. (Def.'s LR 56.1 Stmt. ¶ 73, citing Ng Declaration ¶ 8.) Charlie Chun, Kwok's sales and operations manager, admitted, however, that although there were no "specific guidelines," Kwok's would ordinarily impose a brief unpaid suspension, not termination, as discipline for an initial unexplained absence. (Charlie Chun Dep. 59: 6-12; 92:3-15, 25.) Three months after Suarez's departure, Kwoks hired another Hispanic worker, David Centeno, to do some of the work Suarez had done; the rest was absorbed by Peter Ng and Charlie Chun. (Pl.'s LR 56.1 Resp. ¶ 79.)

### Suarez's Charge

Suarez filed a charge of race discrimination, national origin discrimination, and retaliation with the EEOC on December 12, 2003. (EEOC Charge of Discrimination, Pl's App. Ex. 1, DEF0106.) The EEOC issued a right to sue letter on September 12, 2005, (EEOC Dismissal and Notice of Rights, Pl.'s App. Ex. 1, DEF0111), and on December 12, 2005, Suarez filed this lawsuit against Charles Austin Limited, Kwok's successor,[FN3] charging that Defendant discriminated against him because of his Hispanic status in the amount of his compensation, in the creation of a hostile work environment, and in his termination, and with retaliating against him for his complaints regarding workplace harassment. (Compl.¶¶ 14-18, 19-20.) On May 1, 2006, Suarez amended his complaint to substitute Kwoks International Trading Inc. as named Defendant. (Am.Compl.) Kwok's now moves for summary judgment on all of Suarez's claims. (Def.'s Mot. for Sum. J. 1-2.) Suarez, in turn, moves to strike substantial portions of Kwok's Local Rule 56.1 Response, multiple sections of Kwok's Reply, and one of its supporting affidavits.

> FN3. Both parties agree that Kwok's was involuntarily dissolved on August 2, 2004. (Def.'s LR 56.1 Stmt. ¶ 2; Pl.'s LR 56.1 Resp. ¶ 2.) The court takes judicial notice

that Charles Austin Limited was incorporated on August 20, 1999. *See* Illinois Secretary of State, Corp/LLC-Certificate of Good Standing Search Page, http:// www.ilsos.gov/corporatellc/index.jsp (last visited Sept. 18, 2007). Neither party has included a contention in their Local Rule 56.1 statements regarding when the change from Kwok's to Charles Austin Limited occurred. There is, however, evidence that the company's name was Charles Austin Limited at the time that David Centeno was hired in August of 2003. (Charlie Chun Dep. 45:16-47:4; Charles Austin Limited Application Form, Pl.'s App. Ex. 1, DEF0098.) As explained below, *infra* note 10, both Kwok's and Charles Austin had the same managers.

### DISCUSSION

### I. Summary Judgment Standard

**\*4** Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."FED. R. CIV. P. 56(c). To survive summary judgment, Suarez must identify sufficient evidence to sustain each element of the case he must prove at trial. *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 787 (7th Cir.2007) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). When considering a summary judgment motion, the court construes the facts and draws reasonable inferences in the light most favorable to the non-movant. *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir.2004).

### II. Pay Discrimination Claim

In his Amended Complaint, Suarez alleged that he was not compensated properly in his wages and bo-

nus, while non-Hispanic workers were paid appropriately, and that Kwok's created this disparity because of Suarez's race and national origin. (Am.Compl.¶¶ 11, 16, 18.) Kwok's moved for summary judgment on this pay discrimination claim, on the grounds that (1) Suarez had no evidence that his compensation had anything to do with his Hispanic status, and (2) the pay claim was time-barred. (Def.'s Mem. 9.)

Suarez has apparently waived his pay discrimination claim. In his Response to Defendant's Motion for Summary Judgment, he states in a footnote that he "has not pursued the claim," and therefore declines to respond to Kwok's argument that the claim is invalid. Furthermore, he has admitted, in his Local Rule 56.1 response, that Kwok's determined the amount of his compensation based solely on its business needs, and that his pay had nothing to do with his Hispanic status. (Pl.'s LR 56.1 Resp. ¶ 20.) Such an admission is fatal, because a plaintiff in a Title VII employment discrimination case is required to show that the claimed discrimination occurred "because of" the plaintiff's protected status. 42. U.S.C. § 2000e-2(a)(1) (2000). This means that the plaintiff must show intentional discrimination in a disparate treatment claim, a fact that Suarez has admitted he cannot show with regard to his compensation. *Hildebrandt v. Illinois Dept. of Natural Resources,* 347 F.3d 1014, 1029 (7th Cir.2003).

Kwok's is entitled to summary judgment on the pay discrimination aspect of Suarez's claim.[FN4]

> FN4. Because the unequal pay claim is dismissed on its merits, the court need not address Defendant's assertion that the claim is barred as untimely, because any decision regarding his compensation was made more than 300 days prior to the filing of his EEOC charge. *See* 42 U.S.C. § 2000e-5(e)(1); *Ledbetter v. Goodyear Tire & Rubber Co.,* --- U.S. ----, 127 S.Ct. 2162, 2169-72, 167 L.Ed.2d 982 (2007) (charge must be filed within 300 days of the date on which compensation was de-

termined on allegedly unlawful basis).

### III. Hostile Work Environment Claim

Suarez alleges that Kwok's violated Title VII by discriminating against him on the basis of his Hispanic status, in that he was called racially offensive names, publicly embarrassed, humiliated, and otherwise adversely treated while at Kwok's. (Am.Compl.¶¶ 9, 18, 20.) To establish a hostile work environment, a plaintiff must show (1) that he was subject to unwelcome harassment; (2) that the harassment was based upon his national origin or race; (3) that the harassment was so severe or pervasive that it altered the conditions of his employment; and (4) that there is a basis for employer liability. *Velez v. City of Chicago,* 442 F.3d 1043, 1047 (7th Cir.2006); *Cerros v. Steel Technologies, Inc.,* 398 F.3d 944, 950 (7th Cir.2005) (emphasizing that the harassment may be either severe or pervasive). Kwok's contests Suarez's ability to prove each of these elements, (Df.'s Mem. 6-8), but, as explained below, the court concludes that this claim survives summary judgment.

#### Unwelcomeness

*5 First, a hostile work environment claim requires proof that the plaintiff was subject to unwelcome harassment-in other words, that he found the conduct subjectively unpleasant. Evidence that particular words or conduct constitute unwelcome harassment can include the plaintiff's testimony that the putative harassment made him uncomfortable, evidence that the plaintiff complained about it, and a lack of evidence that the plaintiff encouraged or invited the behavior. *See Kampmier v. Emeritus Corp.,* 472 F.3d 930, 940 (7th Cir.2007) (listing such evidence as the basis for finding a genuine issue of material fact with respect to the unwelcomeness prong).

Suarez has produced enough evidence to satisfy this burden. First, he testified that the use of derogatory terms such as "stupid" and "bendejos" caused him

emotional anguish, made him lose confidence, negatively impacted his self-worth, and created problems in his relationship with his wife. (Suarez Dep. 147:10-22.) Second, he complained about the treatment: He contends that he frequently asked Louis Ng to stop making derogatory comments about his race and national origin, (*id.* at 190:10-17), that he asked Christine Chun to stop calling him "stupid" and "bendejos" on two or three occasions, (*id.* at 191:7-17. 193:18-24, 195:1-11), and that he reported to both Peter Ng and Christine Chun that Louis Ng's behavior was so severe that it caused his brother Armando to quit. (*Id.* at 184:23-186:20.)

Finally, although Kwok's argues that Suarez acqQuiesced to this treatment, (Def.'s Mem. 6), it has not produced evidence that Suarez encouraged the conduct, other than the admitted fact that Suarez himself used profanities in the workplace. (Def.'s LR 56.1 Stmt. ¶ 51; Pl.'s LR 56.1 Resp. ¶ 51; Def.'s Mem. 6.) Although such behavior might be probative of whether the alleged conduct was unwelcome, it is not dispositive; an employee who uses profanity can be the victim of harassment. *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.,* 32 F.3d 1007, 1010-11 (7th Cir.1994) (fact that plaintiff used "F-word" and other crude language did not indicate a desire to be sexually harassed). Drawing all reasonable inferences in Suarez's favor, as the court must, *Foley,* 359 F.3d at 928, the court is unwilling to conclude that Suarez's own use of profanity requires that summary judgment be entered against him.

**"Because Of" Protected Status**

The second element of a hostile work environment claim is that the harassment must be based upon the plaintiff's protected status-in this case, upon Suarez's Hispanic status or his Mexican national origin. *Spearman v. Ford Motor Co.* 231 F.3d 1080, 1085 (7th Cir.2000). This element is satisfied by evidence of a mingling of racially-tinged epithets with other hostile words and actions. *See Shanoff v. Illinois Dept. Of Human Servs.,* 258 F.3d 696,

704-706 (7th Cir.2001) (three racially tinged remarks about the plaintiff's Jewish and Caucasian status, combined with other evidence of hostility, sufficient to establish that harassment was predicated on race). In this case, Suarez has alleged that Louis Ng called him a "bendejos," a "chaqueton," and a "stupid Mexican," (Suarez Dep. 129:1-5), and Louis Ng referred to other Hispanic workers in a discriminatory way every day that he was at work. (*Id.* at 133:3-4.)In addition to this evidence of hostility on Louis Ng's part, there is evidence of the following:

*6 (1) Peter Ng used the term "chaqueton" towards Suarez, called Suarez stupid, and continuously used derogatory language towards other Mexicans (*id.* at 136:11-138:1);

(2) Christine Chun called Suarez stupid and "bendejos" on approximately five occasions (*id.* at 191:7-15; Pl.'s Supp. 2); and

(3) Charlie Chun called Mexicans "chaquetons" "all the time." (Suarez Dep. 141:2-7.)

Taken together, this evidence supports a reasonable inference that the unwelcome harassment directed at Suarez was based upon his status as a Hispanic person and his Mexican national origin.

Kwok's disputes that the contended unwelcome harassment occurred "because of" Suarez's Hispanic status. (Def.'s Mem. 6.) Kwok's argues that Louis Ng's statements, if admissible at all, are not sufficient to establish liability on the part of Kwok's. (*Id.* at 7.) The remaining statements by Peter Ng, Charlie Chun and Christine Chun are insufficient, Kwok's contends, to support an inference of racial motivation. (*Id.* at 6.)

Kwok's challenge to the sufficiency of this evidence requires little discussion. Even if Louis Ng's statements were excluded from consideration, there is sufficient evidence from which a jury could reasonably infer a racial basis in the comments of Peter Ng, Charlie Chun, and Christine Chun. Several

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2874216 (N.D.Ill.)
(Cite as: 2007 WL 2874216 (N.D.Ill.))

statements with a clear racial edge, combined with other harsh conduct, can form the basis of an inference that harassing conduct had a racial basis. *Shanoff,* 258 F.3d at 704-706. Thus, a jury could infer racial hostility towards Hispanics from the evidence that three of Kwok's managers used derogatory Spanish language terms to refer to Hispanic employees, but not to other employees (Suarez Dep. 137:4-7, 140:5-7, 141:4-14), and also called a Hispanic employee stupid on multiple occasions. (*Id.* at 136:17-21, 139:9-16.)

In any event, Suarez has laid an adequate foundation for admission of his testimony that Louis Ng frequently referred to both the plaintiff and other Hispanics as "stupid Mexicans" or proclaimed that "all Mexicans are stupid." All that is needed here (where Louis Ng's comments are obviously not offered for their truth) is a rough description of what Ng said, to whom he said it, and where and when the conversations took place (and the "when" can span many months). *Kemper/Prime Indus. Partners v. Montgomery Watson Americas, Inc.,* No. 97 C 4278, 1998 WL 7498, at *10-11 (N.D.Ill. Sept. 30, 1998); *Houk v. Village of Oak Lawn,* No. 86 C. 139, 1987 WL 7498, at *3-4 (N.D.Ill. Feb.26, 1987). All of these have been provided by Suarez: Louis Ng called Suarez and other Hispanics "stupid Mexicans," "bendejos," and "chaqueton." (Suarez Dep. 124:3-4, 128:18-129:7, 162:21-163:7.) He did this both in the office, (*id.* at 130:19-23), and out of the office, in the presence of the workers on the shop floor. (*Id.* at 129:8-17.)There is no evidence that Louis Ng used this language in reference to Suarez in the presence of Peter Ng or Christine Chun, (*id.* at 129:18-23), but he did assertedly use such language regarding other shipping department, while in the office on more than five occasion in Christine Chun's presence. (*Id.* at 162:21-163:7.)Such details provide adequate foundation for admission of this evidence regarding Louis Ng's conduct. Thus, Suarez has produced sufficient evidence to show that there is a material dispute over whether Kwok's management was harassing him "because of" his race and national origin.

**Severity or Pervasiveness**

*7 The third question is whether the harassment was so objectively severe or pervasive that it altered the conditions of Suarez's employment and created a hostile working environment. *Velez v. City of Chicago,* 442 F.3d at 1047. A plaintiff can show a material issue of fact with respect to this element by offering evidence of just a few uses of a reference to plaintiff's race by a supervisor, coupled with other harsh or harassing conduct that was not explicitly racial. *Shanoff,* 258 F.3d at 704-06;*Rodgers v. Western-Southern Life Ins. Co.,* 12 F.3d 668, 675-76 (7th Cir.1993) (two uses of the word "nigger" by plaintiff's supervisor, combined with disparaging remarks about the intelligence of black people, and some other, more ambiguous evidence, sufficed to create a hostile work environment). As described above, Suarez contends that (1) Christine Chun called him "stupid" and "bendejos" on about five occasions, despite being asked to stop (Suarez Dep. at 191:7-9, 195:1-11; Pl.'s Supp. 2); that (2) Peter Ng used the term "chaqueton" about him and used derogatory terms about other Mexicans (Suarez Dep. 136:11-138:1); that (3) Charlie Ng called other Mexicans "chaquetons" on a regular basis (*id.* at 141:2-7); and that (4) Louis Ng routinely called Mexicans, including Suarez, "stupid Mexicans," "bendejos" and "chaquetons," and proclaimed that "all Mexicans are stupid." (*Id.* at 124:3-4, 128:18-129:7, 162:21-163:12.)Even if these comments are not deemed severe, their frequency and pervasiveness satisfies the court that a jury could reasonably find that the united conduct of all four managers created a hostile working environment. *See Cerros v. Steel Techs., Inc.,* 398 F.3d 944, 950 (7th Cir.2005) (explaining that "there is no magic number of slurs that indicate a hostile work environment").

Kwok's correctly notes that one comment by a supervisor that a subordinate is stupid, by itself, does not support a charge of discrimination. *Massey v. Blue Cross-Blue Shield of Illinois,* 226 F.3d 922, 926 (7th Cir.2000); *see also Yuknis v. First Student,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Inc.,* 481 F.3d 552, 555 (7th Cir.2007); *Hong v. Children's Mem'l Hosp.,* 993 F.2d 1257, 1266 (7th Cir.1993) (in a wrongful termination case, court notes that "occasional or sporadic use of slurs" and repeated admonishments that plaintiff must "learn to speak English" is not indicative of discrimination.) Here, however, the evidence Suarez proffers involves not a single term of abuse, but a variety of abusive terms, including both the use of Spanish-language derogatory terms by non-Spanish speakers only when speaking to Hispanics, as well as direct comments such as "Mexicans are stupid" and the use of "stupid Mexican" as an epithet. Even if the use of one such phrase may not by itself be actionable, it may be part of a campaign of harassment. Suarez has presented enough evidence of harassment that a reasonable jury could find that his working environment was hostile, and that is all he need do at this stage.

**Employer Liability**

**\*8** Finally, Suarez must show that there is a basis for employer liability with respect to the claimed hostile work environment. "An employer is liable for a hostile work environment either if a supervisor created the hostile work environment, or if a co-worker created the hostile work environment and the employer was negligent either in discovering or remedying the harassment." *Velez,* 442 F.3d at 1047 (internal punctuation omitted). Suarez states a claim under both theories.

First, Suarez presents evidence that Peter Ng, Charlie Chun, and Christine Chun were his supervisors for Title VII purposes. To do so, he must offer evidence that they had the power to "directly affect the terms and conditions of the plaintiff's employment" with respect to hiring, firing, demotion, transfer or discipline. *Id.* Kwok's admits that Peter Ng had the power to oversee the hiring and firing of all employees. (Def.'s LR 56.1 Resp. ¶ 3.) Suarez's contention that Charlie Chun also had the power to hire or fire members of the sales force, (Pl.'s LR 56.1 Stmt. ¶ 1), is also supported by evidence:

Asked during his deposition "Who else was in charge of hiring and firing?"Peter Ng responded, "We have three to four people who were in charge," and listed the first of those people as Charlie Chun. (Ng Dep. 16:22-17:7.) Finally, there is a reasonable inference that Christine Chun may have been Suarez's supervisor. Peter Ng claimed that she had control of hiring and firing for "some of [the employees]," (*id.* at 16:12-14), Kwok's admitted that she was in charge of hiring, (Def.'s LR 56.1 Resp. ¶ 2), and Suarez contends that it was Ms. Chun who actually fired him. (Suarez Dep. 50:11-12, 114:13-14, 187:6-11.)

In light of this conclusion, the court need not reach the question of whether Kwok's is liable for the conduct of Louis Ng, but will address it briefly. Notably, although there is evidence that Louis Ng is a "manager and owner of Kwoks," (EEOC Charge of Discrimination, Pl.'s App. Ex. 1, DEF0107 ¶ 4; Charles Austin Limited's EEOC Response, Pl.'s App. Ex. 1, DEF0112 ¶ 4), Suarez has admitted that Louis Ng was not *his* supervisor, both in his Local Rule 56.1 Response, (Pl.'s LR 56.1 Resp. ¶ 53), and in his deposition testimony. (Suarez Dep. 125:23-4.) Nor has Suarez suggested that Louis Ng had the power to hire, fire, demote, transfer or discipline him. Suarez may still establish employer liability for Louis Ng's conduct, however, if he can produce sufficient evidence that Kwok's was negligent in failing to either discover or remedy harassment inflicted by a co-worker. Defendant admits that Louis was at least a "part-time employee" of Kwok's,[FN5] (Def.'s LR 56.1 Resp. ¶ 4), so the only question is whether Kwok's was negligent in discovering or remedying his allegedly harassing behavior.

> FN5. Kwok's has exhibited a remarkable level of confusion regarding Louis Ng's role in its operations, particularly given the fact that he is apparently the brother of an owner and manager, Peter Ng. (Ng. Decl. ¶ 10, Date Illegible, Filed Jan. 19, 2007.) After admitting in the EEOC proceedings

Slip Copy
Slip Copy, 2007 WL 2874216 (N.D.Ill.)
(Cite as: 2007 WL 2874216 (N.D.Ill.))

Page 9

that he was an "owner and manager" (EEOC Charge of Discrimination, Pl.'s App. Ex. 1, DEF0107 ¶ 4; Charles Austin Limited's EEOC Response, Pl.'s App. Ex. 1, DEF0112 ¶ 4), Kwok's later asserted in its Local Rule 56.1 statement, based on a declaration by Peter Ng, that Louis Ng never worked at Kwok's at all. (Def.'s LR 56.1 Stmt. ¶ 53; Ng Decl. ¶¶ 11-13, Date Illegible, Filed Jan. 19, 2007.) Kwok's reversed itself again in its 56.1 Response, claiming now that Louis Ng was a "part-time employee" (Def.'s LR 56.1 Resp. ¶ 4) based on the testimony of Charlie Chun. (Charlie Chun Dep. 98:5-9.) Perhaps most telling was Charlie Chun's deposition testimony that Louis Ng "basically ran the-I wouldn't say-watched over the warehouse, the shipping and receiving, and just to make sure that no one was doing something they weren't supposed to [do]." (Charlie Chun Dep. 69:16-19.) This purported confusion about the role of an owner's brother is troubling, particularly in light of a defensive strategy that relies significantly on minimizing the role of Louis Ng in management. (See Def's Mem. 7-8.)

When an employer is notified of harassment, that employer can be negligent if it does not take appropriate steps to rectify the situation. See Hostetler v. Quality Dining, Inc., 218 F.3d 798, 809-10 (7th Cir.2000). Informally notifying as few as two supervisory employees of incidents of harassment can constitute notice. Id. at 803, 809; see also Phelan v. Cook County, 463 F.3d 773, 776-778, 786 (7th Cir.2006) (reports to two supervisors, plus one incident where a third supervisor observed harassment, constitute sufficient notice). Kwok's argues that the notice in this case is insufficient, because Suarez made at most only a "single complaint." (Def.'s Mem. 8.) Suarez, however, points to at least three complaints he made about Louis Ng's behavior: one to Christine Chun about how Louis Ng had

called him a "stupid Mexican," (Suarez Dep. 125:8-14), and one each to Christine Chun and Peter Ng explaining that his brother Armando had quit because Louis Ng repeatedly called him a "stupid Mexican." (Id. at 185:12-186:14.)Suarez also contends that Louis Ng's harassing behavior often occurred in the presence of both Christine Chun,[FN6](id. at 161:9-162:24), and Charlie Chun.FN7(Charlie Chun Dep. 165:8-17.) Taken together, this evidence would permit a jury to find that Kwok's had enough information that a reasonable employer might think that it was possible that Louis Ng was harassing Hispanic employees.

> FN6. Kwok's once again raises a foundation objection to this evidence. (Def's Mem. 8.) Suarez's description of the occasions when Christine would overhear Louis Ng make derogatory comments includes the terms he would use ("stupid Mexicans," "bendejos," "chaqueton"); where he would use them (the office area); to whom he was speaking to (workers in the shipping department), and approximately how many times this would occur (more than five). The only element not specified is the time when these conversations occurred, and this can be inferred to be the five to six month period from between when Christine Chun began working at Kwok's and when Suarez's employment ended. Thus, the court finds that there is a basis on which to believe this testimony would be admitted, and therefore the foundation objection is not valid. See United States v. Prude, 489 F.3d 873, 878 (7th Cir.2007); Houk, No. 86 C. 139, 1987 WL 7498, at *3-4.

> FN7. Charlie Chun admitted during his deposition overhearing, about once a week, comments by Louis Ng to Hispanics that were "offensive or negative," though in his view not "derogatory." (Charlie Chun Dep. 165:8-17.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*9** Because Kwok's was on notice that Louis Ng behaved in a harassing fashion, it was under a duty to act to remedy his behavior. This, Suarez contends, did not occur. Suarez testified that Christine Chun took no action to address the harassment after his first report, (Suarez Dep. 125:1-5), and that the harassment continued unabated after his complaint. (*Id.* at 149:19-150:1). He contends, further, that Christine witnessed such conduct in February, but that it continued, sometimes witnessed by her, throughout March and April. (Pl.'s Supp. 2.) He asserts that Christine herself called him "stupid" and "bendejo" in March, that he complained at that time, and that she continued to do so during the month of April. (*Id.*) A jury could reasonably infer from the continuation of both Louis Ng's conduct, and the general conduct of management towards Suarez, that management took either no action or inadequate action. *See Phelan,* 463 F.3d at 786 (when complaints are to no avail, this supports a finding of negligence).

The court concludes Suarez has shown these are disputes of fact concerning all four elements of a work environment claim. Therefore, Kwok's motion for summary judgment on that claim is denied.

## IV. Discriminatory Termination Claim

Suarez also alleges that he was discharged for discriminatory reasons. (Am.Compl.¶¶ 14, 20.) Title VII prohibits an employer from terminating an employee because of his race or national origin. 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff can defeat summary judgment on a termination claim in either of two ways: by providing direct proof of discrimination, or by the indirect, "burden-shifting" method that originated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).*Brewer v. Bd. of Trustees of the Univ. of Ill.,* 479 F.3d 908, 915 (7th Cir.2007). For reasons discussed below, the court concludes that the disputes of material fact preclude summary judgment in Defendant's favor under the direct method. Before presenting that analysis, however,

the court notes the parties' confusion on the question whether Suarez was terminated at all. Each side has managed to simultaneously argue both that Kwoks did, and did not, terminate Suarez. Confusingly, Kwoks claims both that it terminated Suarez after he failed to return to work, (Def.'s LR 56.1 Stmt. ¶ 73), and that it did not fire him. (*Id.* ¶ 75.)Matters are made worse because Suarez denies both statements, effectively contending simultaneously that he was, and was not, fired. (Pl.'s LR 56.1 Resp. ¶¶ 73, 75.) Because both parties have directed its attention to evidence that Kwok's terminated Suarez's employment, the court concludes Suarez can establish this element of his claim. (Ng Decl. ¶ 8, Date Illegible, Filed Jan. 19, 2007; Suarez Dep. 50:11-12, 114:13-14, 187:6-11.)

To show that his termination violated Title VII under the direct method, Suarez must demonstrate either by direct evidence or a "convincing mosaic" of circumstantial evidence, that the termination occurred because of intentional discrimination by the decisionmaker. *Phelan v. Cook County,* 463 F.3d 773, 779 (7th Cir.2006). Relevant evidence can include evidence of suspicious timing, as well as evidence of behavior towards members of the protected class, especially when proximate in time to the termination. *Id.* at 781-82.Also relevant is evidence that suggests that the proffered reason for the termination is a pretext. *See id.* at 782;*Sylvester v. SOS Children's Vills. Ill., Inc.,* 453 F.3d 900, 905 (7th Cir.2006).

**\*10** When a plaintiff presents (1) substantial evidence of significant harassment, in which his supervisors have participated, leading up to and until the time of his termination, coupled with (2) evidence suggesting that the proffered reason for his termination is pretextual, his claim survives summary judgment. *Phelan,* 463 F.3d at 781-82;*Sylvester,* 453 F.3d at 905. In *Phelan,* the plaintiff was the victim of an ongoing campaign of verbal and physical sexual harassment, in which members of the human resources staff and her supervisor participated. 463 F.3d at 782. The hearing officer selected to preside

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

over plaintiff's termination hearing had also made discriminatory comments, and a subsequent an internal review concluded found that the claimed basis for her termination was unjustified. *Id.* On the basis of this evidence, the court concluded that a grant of summary judgment was inappropriate. *Id.*

Suarez presents a similar mosaic of circumstantial evidence. As discussed above in the hostile work environment section, he has produced substantial evidence of workplace harassment of Hispanics, in which Peter Ng, Charlie Chun, and Christine Chun all participated. The namecalling directed at Plaintiff and other workers of Mexican origin continued into April of 2003. (Pl.'s Supp. 2.) As discussed earlier, Suarez contends that Charlie Chun, Christine Chun, and Peter Ng each have control over hiring and firing. As the parties agree that Suarez was terminated in early May of 2003, (Def.'s LR 56.1 Stmt. ¶ 67; Pl.'s LR 56.1 Resp. ¶ 67), the proximity in time of numerous statements evidencing racial animus[FN8] by those with power over his employment constitutes circumstantial evidence that he was terminated because he is Hispanic. *Phelan,* 463 F.3d at 781-82;*see also Volovsek v. Wisc. Dept. of Agric., Trade and Consumer Prot.,* 344 F.3d 680, 690 (7th Cir.2003) (holding that an isolated discriminatory comment, which would normally be inadequate to survive summary judgment, is sufficient evidence of discrimination when it occurs within minutes of a termination).

> FN8. Kwok's argues that the use of Spanish-language obscenities solely towards Hispanic employees should be viewed as merely workplace profanity, without any inference of racial hostility. (Def.'s Reply 5.) Perhaps a jury might draw such an inference, but it is for a jury to do so, not this court. Summary judgment is not an appropriate vehicle for resolving disputes as to the interpretation of ambiguous language.*Phelan,* 463 F.3d at 782.

Suarez has also gathered significant evidence tend-

ing to show that Kwok's explanation for terminating him is not credible. Kwok's claims that it terminated Suarez for failing to report to work, and for bringing his laptop home when he was not authorized to do so. (Def.'s LR 56.1 Stmt. ¶¶ 70, 73.) [FN9] Suarez has produced significant evidence that, if believed, supports the inference that this is a pretext. First, Kwok's allegedly cut off service on Suarez's work cell phone and cancelled his credit card expense account prior to his absence, (Suarez Dep. 50:3-12), suggesting hostility toward Suarez before his absence from work. Second, Peter Ng testified that he believed Suarez to be working from home during his absence, and that he expected him to return. (Ng Dep. 56:3-6, 65:2-3.) Third, Charlie Chun testified that it was not Kwok's policy to terminate employees as a first punishment for even unexplained absences. (Charlie Chun Dep. 92:3-18.) Viewing the evidence in the light most favorable to Suarez, there is a dispute of fact concerning Kwok's claim that he was fired for missing "more than two days" of work and for bringing his laptop home.

> FN9. Although Kwok's does contend that Suarez had some performance problems while employed there, (Def.'s LR 56.1 Stmt. ¶¶ 40-42), it admits that these problems were not the reason Kwok's terminated Suarez's employment. (Def.'s LR 56.1 Resp. ¶ 30.)

**\*11** Kwok's urges, citing *Sun v. Board of Trustees of the University of Illinois,* 473 F.3d 799, 814 (7th Cir.2007), that his replacement by another Hispanic individual, David Centeno, defeats Suarez's claim.FN10*Sun* does not address this argument, however. *Flowers v. Crouch-Walker Corporation,* 552 F.2d 1277, 1282 (7th Cir.1977), is sometimes read to stand for the proposition that the indirect method of proving discriminatory termination requires proof the employer replaced plaintiff with someone outside the protected class. More recent Seventh Circuit cases have enunciated the requirements for proof of discriminatory termination

Slip Copy
Slip Copy, 2007 WL 2874216 (N.D.Ill.)
**(Cite as: 2007 WL 2874216 (N.D.Ill.))**

without including this extra element. *E.g., Salas v. Wisc. Dept. of Corrs.,* 493 F.3d 913, 922 (7th Cir.2007) (listing four elements, none of which correspond to the extra language in *Flowers* );*Burks,* 464 F.3d at 750-51 (same).

> FN10. Defendant raises this argument while discussing the indirect method, but the court considers the argument here to make clear that it does not bar Suarez's termination claim under the direct method.

In any event, to the extent there is any such requirement for claims relying on the indirect, burden-shifting method, it is inapplicable here. *See Bailey v. Binyon,* 583 F.Supp. 923, 928 (N.D.Ill.1984) (commenting that it would be "absurd" to apply the *Flower* rule to a case where there was convincing direct evidence of discriminatory intent, such as an admission of racial hostility). Though Kwok's replacement of Suarez with another Hispanic employee may weaken the inference of discrimination, it does not defeat Suarez's claim as a matter of law.FN11

> FN11. Neither party has explicitly stated who managed Charles Austin Limited in their Local Rule 56.1 Statements or Responses. In his first complaint, Suarez did contend that Peter Ng, Louis Ng and Christine Chun were managers of Charles Austin Limited, (Compl.¶ 8), and Kwok's, in its answer, admitted that Peter Ng and Christine Chun managed that company. (Answer ¶ 8.) Furthermore, in his EEOC charge against Charles Austin Limited, Suarez alleged that the same three individuals were managers of that company (EEOC Charge of Discrimination, Pl's 56.1 App. Ex. 1, DEF0107 ¶ 4), and Charles Austin Limited admitted that this was true. (Charles Austin Limited's EEOC Response, Pl'.s App. Ex. 1, DEF0112 ¶ 4). Thus, given that the record is devoid of evidence supporting the contention that any other person was a manager of Charles

Austin Limited at the time Centeno was hired, this court assumes for the purpose of this motion that both companies had the same management.

**IV. Retaliatory Termination Claim**

Suarez's final claim is that Kwok's terminated his employment in retaliation for his complaints about harassing behavior. (Am.Compl.¶¶ 12, 14, 19.) Title VII prohibits employers from discriminating against an employee because he has opposed any practice that violates Title VII. 42 U.S.C. § 2000e-3(a) (2000). To prevail on his retaliation claim, Suarez must show (1) that he engaged in a statutorily protected activity, (2) that Kwok's took an adverse action against him, and (3) that the adverse action was caused by his protected activity.*Salas,* 493 F.3d at 924. Suarez can prove retaliation either directly or indirectly. *Id.*

The indirect method requires proof that the plaintiff engaged in protected activity, that he was performing his job adequately, that his employer took an materially adverse action against him, and that another similarly situated employee who did not engage in protected activity was not so treated. *Id.* Suarez has made no effort to identify similarly situated employees who did not complain of harassment but were treated more favorably.

To proceed under the direct method, Suarez can raise an inference that an adverse action occurred because of protected activity, by showing (1) a protected activity, (2) an adverse action, and (3) causation. *Salas,* 493 F.3d at 924. Protected activity includes complaints about harassing treatment based upon a protected characteristic. *Boumehdi,* 489 F.3d at 792. at 792-93. As described above, Suarez has alleged multiple complaints about harassing conduct, including:

**\*12** (1) a complaint to Christine Chun that Louis Ng had called him a "stupid Mexican" (Suarez Dep. 125:7-14);

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(2) numerous complaints to Louis Ng about his own harassing conduct (*id.* at 190:10-19);

(3) several complaints to Christine Chun about her use of the words "stupid" and "bendejo" towards him (*id.* at 195:1-2); and

(4) complaints to both Christine Chun and Peter Ng that Louis Ng had caused Suarez's brother Armando to quit by calling him a "stupid Mexican" (*id.* at 170:15-18, 184:23-186:20).

Furthermore, termination is an adverse employment action. *See O'Neal v. City of Chicago,* 392 F.3d 909, 911 (7th Cir.2004). Suarez contends that he was terminated (Suarez Dep. 50:11-12, 114:13-14, 187:6-11), so this element is satisfied as well.

Causation is Suarez's final hurdle. Suarez can show that he was fired because of (in retaliation for) his complaints either through direct evidence (*i.e.* an admission) of retaliatory intent, or through circumstantial evidence. *Boumehdi,* 489 F.3d at 792. Relevant circumstantial evidence can include suspicious timing, as well as evidence of behavior toward employees in the protected group. *Id.* If an employee is fired not long after complaining about harassment, the suspicious timing supports an inference of retaliation. *Id.* at 493; *Sylvester,* 453 F.3d at 905. For instance, if an adverse action occurs just one month after complaints about discrimination, a jury can infer intent to retaliate. *Boumehdi,* 489 F.3d at 786-87, 793. In this case, Suarez contends that he complained multiple times about harassing conduct at Kwok's. The first complaint he describes was his complaint to Christine Chun about Louis Ng's behavior, which occurred in late January or early February of 2003-as little as three months before he was terminated. (Pl.'s Supp. 1.) He also contends that he complained to Christine Chun about her own conduct toward him several times in March and April of 2003 (*id.* at 2), meaning that at least some of his complaints to her, about her own behavior, occurred within a month of when she terminated his cell phone service, and then fired him. FN12

FN12. Kwok's again objects to this evidence on foundation grounds, (Def.'s Reply 10), but for the reasons explained earlier, the objection is overruled. Suarez has identified both participants in the conversations (himself and Christine Chun); has summarized their contents (he complained about harassing statements by Ms. Chun and Louis Ng); and has provided general information about when they occurred (in the late Winter and Spring of 2003). The Court infers that the conversations took place somewhere in the workplace.

In this case, the inference created by suspicious timing is strengthened by evidence suggesting that Kwok's asserted reasons for firing Suarez were pretextual. *Volovsek,* 344 F.3d at 689-90. As discussed above, Suarez has introduced substantial evidence tending to show that the claimed reason for his termination, his absence from work, is a pretext for discrimination. The combination of somewhat suspicious timing, knowledge of his complaints by the person who fired him, and evidence that the claimed reason for his termination is a pretext, allows a reasonable jury to infer an intent to retaliate.

Kwok's argues that Surarez has admitted retaliation is not the reason he was terminated: To the contrary, Kwok's urges, Suarez "contends that the real reason for his termination was so that Defendant could steal his customers."(Def.'s Reply 9.) Kwok's refers to Suarez's statement that Kwok's "used him because of his contacts and terminated him when he was not needed anymore since in effect Kwok's had stolen [his] customers."(Pl.'s LR 56.1 Resp. ¶ 77.) In the court's view, Suarez's statement is perfectly consistent with his claim that he was terminated for a retaliatory reason. That Kwok's felt free to fire Suarez because it no longer needed him for his client list does not necessarily mean that it would have done so if he had not complained about their harassment of Hispanic employees. Notably, contrary to Kwok's characterization, Suarez never admitted that a desire to steal his customers was "the

Slip Copy
Slip Copy, 2007 WL 2874216 (N.D.Ill.)
**(Cite as: 2007 WL 2874216 (N.D.Ill.))**

real reason" for anything. Thus, Kwok's motion for summary judgment on Suarez's retaliation claim fails.

### V. Suarez's Motions to Strike

**\*13** Suarez has filed two motions to strike, specifically directed at portions of Kwok's Reply and its response to his Local Rule 56.1 Statement of Additional Facts. Motions to strike are disfavored except when they serve to expedite the work of the court. *RLJCS Enters., Inc. v. Prof'l Benefit Trust, Inc.,* 438 F.Supp.2d 903, 906-07 (N.D.Ill.2006). Because Plaintiff's substantive claims survive summary judgment, his motions to strike are denied as moot.

### CONCLUSION

For the reasons explained above, Kwok's motion for summary judgment (34) is granted on Suarez's pay discrimination claim and otherwise denied. Suarez's motion to strike (56, 57) are denied as moot.

N.D.Ill.,2007.
Suarez v. Kwoks Intern. Trading, Inc.
Slip Copy, 2007 WL 2874216 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 1
Slip Copy, 2006 WL 3302679 (S.D.Ill.)
(Cite as: 2006 WL 3302679 (S.D.Ill.))

c
Edsall v. CSX Transp., Inc.
S.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. Illinois.
Ricky Lee EDSALL, Plaintiff,
v.
CSX TRANSPORTATION, INC., Defendant.
No. 05-CV-903-WDS.

Nov. 14, 2006.

Matthew H. Armstrong, Roger C. Denton, Sch-
lichter, Bogard et al.; St. Louis, MO, for Plaintiff.
Richard F. Nash, Zora Manjencich, Brasher Law
Firm, St. Louis, MO, for Defendant.

### MEMORANDUM & ORDER

STIEHL, District Judge.
*1 Before the Court is defendant's motion to trans-
fer (Doc. 15) to which plaintiff has filed a response
(Doc. 19) and the defendant a reply (Doc. 22).

### BACKGROUND

Plaintiff filed his complaint against defendant, his
former employer, seeking to recover for alleged
work-related injuries under the Federal Employers'
Liability Act, 45 U.S.C. § 51et seq. Defendant has
filed a motion pursuant to 28 U.S.C. § 1404(a),
seeking to transfer this cause of action to the United
States District Court for the Northern District of In-
diana.

In its motion to transfer, defendant argues that
plaintiff's choice of venue in this case is not entitled
to deference because no nexus exists between the
causes of action and the Southern District of
Illinois. Defendant, relying on two affidavits, con-
tends that plaintiff worked in or around Garrett, In-
diana, for the majority of his employment with the
defendant and that he did not spend any time work-
ing in Southern Illinois. Defendant also asserts that

the case should be transferred because at least
twenty-seven (27) potential witnesses are located in
the Northern District of Indiana, and that the Dis-
trict Court for the Northern District of Indiana will
be able to compel their appearance. Finally, defend-
ant maintains that the interests of justice would be
better served by the transfer of this action to the
Northern District of Indiana where the alleged in-
juries occurred.

In response, plaintiff argues that the defendant
should be precluded from seeking transfer at this
stage of the proceeding because it did not do so
when this case was set for trial. Plaintiff also as-
serts that defendant's motion should be denied be-
cause transfer of the case would not further the in-
terest of justice, and that the motion is part of an
ongoing "tactic of delay ." Plaintiff also claims that
his choice of venue should be given substantial de-
ference under the Federal Employers' Liability Act,
and that for these reasons the motion to transfer
should be denied.

### ANALYSIS

*I. Motion to Transfer Standards*

28 U.S.C. § 1404(a) provides: "[f]or the conveni-
ence of parties and witnesses, in the interest of
justice, a district court may transfer any civil action
to any other district or division where it might have
been brought."The Seventh Circuit has held that the
trial court should consider "the relative ease of ac-
cess to sources of proofs; availability of compuls-
ory process for attendance of unwilling, and the
cost of obtaining attendance of willing witnesses;
the possibility of a view of the premises; the state
of the court calendar both in the District where the
case is pending and in the District to which it is
sought have the case transferred." *Chicago R.I. &
R.P. Co. v. Igoe,* 220 F.2d 299, 303 (7th Cir.1955).

"In passing on a motion for transfer, the district

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 3302679 (S.D.Ill.)

**(Cite as: 2006 WL 3302679 (S.D.Ill.))**

Page 2

judge must consider the statutory factors in light of all the circumstances of the case. The weighing of factors for and against transfer necessarily involves a large degree of subtlety and latitude, and, therefore, is committed to the sound discretion of the trial judge." *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 219 (7th Cir.1986). Furthermore, "[t]he movant ... has the burden of establishing, by reference to particular circumstances, that the transferee forum is clearly more convenient." *Id.* at 219-20.However, "[l]ess of a showing of inconvenience is needed for a § 1404(a) transfer than that for a *forum non conveniens* dismissal." *Id.* at 220.

*A. Plaintiff's Choice of Venue*

**\*2** Defendant argues that plaintiff's choice of venue in this case is not entitled to deference because there is no relationship or nexus between the cause of action and the Southern District of Illinois. While courts generally respect a plaintiff's choice of forum, the Seventh Circuit has held that a plaintiff's freedom to select his or her own forum "has minimal value where none of the conduct complained of occurred in the forum selected by the plaintiff...." *Igoe,* 220 F.2d at 304 (*quoting Josephson v. McGuire,* 121 F.Supp. 83, 84 (D.C.Mass.1954)). In the record on this case, plaintiff's own affidavit fails to make any connection at all between the work-related injuries that give rise to the complaint and the Southern District of Illinois. The affidavit provides that plaintiff's employment with CSX required him "to travel East to Alliance and Williard, Ohio, North to Holland and Benton Harbor, Michigan, West to Riverdale and Chicago, Illinois, and in the Chicago Division in Indiana, along the Garrett and Gary line."(Affidavit of Edsall, Sr. at ¶ 2.) Conspicuously absent from the description of plaintiff's various work locations is any mention of any locale within the Southern District of Illinois. Plaintiff also fails to contest the statement of CSX's Senior Claims Representative, Raymond J. Sheahan, III, that "[a]t no time during his railroad career has [P]laintiff worked in Southern Illinois or in any of

the counties located within the jurisdiction of this Court."(Affidavit of. Sheahan at ¶ 5.) Accordingly, this Court finds that plaintiff's choice of venue is of little value because none of the conduct complained of occurred in this District.

The Court is simply not persuaded by plaintiff's assertion that under the Federal Employers' Liability Act ("FELA") his choice of venue is entitled to greater consideration. Simply put, plaintiff lacks any significant connection with this forum. As one court properly stated, "as a general rule, when the plaintiff does not reside in his chosen forum nor have any operative facts occurred within the forum, the plaintiff's choice is entitled to less consideration *notwithstanding that it is a FELA action."Robertson v. Kiamichi R.R. Co.,* 42 F.Supp.2d 651, 656 (E.D.Tex.1999) (emphasis added).

*B. Timing of Defendant's Motion*

Plaintiff contends that the motion to transfer should be denied because defendant did not act with reasonable promptness in moving for a transfer of venue and characterizes the timing of defendant's motion as a delay tactic. While the Seventh Circuit has not specifically ruled on this issue, this Court agrees with the rule that "a motion to transfer should be made early in the proceeding."*Blumenthal v. Mgmt. Assistance, Inc.,* 480 F.Supp. 470, 471 (N.D.Ill.1979). Further, "a mere passage of time or delay is not alone sufficient to deny a motion to transfer."*Id.* In other words, "[t]he motion may be made at any time, though delay in moving is a factor that will be considered in passing on the motion." 20 Charles Alan Wright & Mary Kay Kane, Federal Practice and Procedure § 46 (2002). Therefore, while the timing of defendant's motion is not dispositive, it is a factor that this Court takes into account when weighing the reasons for and against transfer.

*C. Convenience of the Parties*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3302679 (S.D.Ill.)
(Cite as: 2006 WL 3302679 (S.D.Ill.))

**\*3** Defendant maintains that the Northern District of Indiana is a more convenient location for the parties because of its proximity to CSX's facilities and to plaintiff's residence. Plaintiff, citing *Am. Can Co. v. Crown Cork & Seal Co.,* 433 F.Supp. 333, 338 (E.D .Wisc.1977), claims that a defendant can assert its own inconvenience, but not the inconvenience of the plaintiff in support of a motion to transfer. Clearly, "the logical starting point for analyzing convenience is to consider the parties' residences."*Robertson,* 42 F.Supp.2d at 657. Plaintiff resides in Albion, Indiana. According to *Google Maps,* Albion, Indiana is approximately 390 miles from East St. Louis, Illinois, (the location of this Court) but it is only 30 miles from Fort Wayne, Indiana, (the location of the District Court for the Northern District of Indiana). Because plaintiff's choice of venue has minimal value in this case, the "convenience of the parties" factor clearly weighs in favor of transferring this case to the Northern District of Indiana.

### D. Convenience of Witnesses

Defendant also maintains that the Northern District of Indiana is more convenient for the vast majority of witnesses in this case. Plaintiff replies that the convenience of witnesses is not an issue in this case because there are witnesses in several states and regardless of where the trial is held, some witnesses will have to travel. Although this may be true, it is not particularly relevant in determining whether a particular venue is more convenient. Rather, "the court must look to the nature and quality of the witnesses' testimony with respect to the issues of the case."*Hanley v. Omarc, Inc.,* 6 F.Supp.2d 770, 775 (N.D.Ill.1998). Significantly, the only person who plaintiff identified in his interrogatory answers as being present at the scene of the alleged incidents, Dave Swonger, lives in Indiana. In addition, all of plaintiff's treating physicians, with the exception of one, live in the Northern District of Indiana.

Of course, "the court must ... consider whether these witnesses will be subject to compulsory pro-

cess...."*Omarc, Inc.,* 6 F.Supp.2d at 775. Defendant has at least twenty-seven (27) potential witnesses who are located in the Northern District of Indiana. These witnesses would only be subject to compulsory process if defendant's motion to transfer were granted. Plaintiff has one potential witness who maintains an office in the Southern District of Illinois (Dr. Schoedinger) and also intends to call witnesses from Michigan, Ohio, and Florida. Notably, the witnesses located in Michigan, Ohio, and Florida would not be subject to compulsory process even if defendant's motion to transfer were denied. In light of all of the above, the Court **FINDS** that the "convenience of the witnesses" factor weighs strongly in favor of transfer.

### E. Interest of Justice

Finally, plaintiff asserts that because of the relative docket conditions of each court and statistics regarding speedy trials, he would be more likely to receive a speedy trial by remaining in the Southern District of Illinois. In support of this, plaintiff has provided the Court with statistical evidence to support this argument. The likelihood of delay must be weighed against the other sub-factors included in the "interest of justice" analysis. Importantly, the relative ease of access to sources of proof and the possibility of a view of the premises must be included in the balance and weighed against the risk of delay. *See Igoe,* 220 F.2d at 303. Plaintiff admits that sources of proof are more accessible in the Northern District of Indiana but argues that this factor is not significant. However, the possibility of a view of the premises also weighs in favor of transferring the case to the Northern District of Indiana. Plaintiff does not argue that any of his injuries occurred in the Southern District of Illinois. Moreover, most of plaintiff's railroad career and the injury alleged in Count II of the complaint occurred in the Northern District of Indiana. As a result, this Court believes that the relative ease of access to sources of proof plus the possibility of a view of the premises outweighs the likelihood of delay in determining whether transfer of this case is in the in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3302679 (S.D.Ill.)
(Cite as: 2006 WL 3302679 (S.D.Ill.))

terest of justice.

### CONCLUSION

**\*4** Therefore, the Court **FINDS** that this case should be transferred to the Northern District of Indiana. Plaintiff's choice of venue has minimal value because none of the conduct complained of occurred in the forum selected by plaintiff. Additionally, the Northern District of Indiana is closer to plaintiff's residence and the district court in Indiana would have subpoena power over a larger number of important witnesses. Finally, although the Court realizes that plaintiff's case may be minimally delayed because of this transfer, this factor is outweighed because the sources of proof and the site of plaintiff's alleged injury are located in the Northern District of Indiana.

For the foregoing reasons, defendant's motion to transfer this case to the Northern District of Indiana is **GRANTED,** and this case is **TRANSFERRED** to the United States District Court for the Northern District of Indiana.

IT IS SO ORDERED.

S.D.Ill.,2006.
Edsall v. CSX Transp., Inc.
Slip Copy, 2006 WL 3302679 (S.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2007 WL 925511 (C.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 925511 (C.D.Ill.))**

C

Industrias Kirkwood S.A. de C.V. v. Andrew Corp.
C.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court, C.D. Illinois.
INDUSTRIAS KIRKWOOD S.A. de C.V.,
Plaintiff,
v.
ANDREW CORPORATION, a Delaware Corporation, Defendant.
No. 06-3242.

March 23, 2007.

David A. Herman, Elizabeth R Gaffney, Giffin Winning Cohen & Bodewes PC, Springfield, IL, for Plaintiff.
Jeffrey J. Mayer, Rachel Elisabeth Atterberry, Freeborn & Peters, Chicago, IL, John E. Stevens, Freeborn & Peters, Springfield, IL, for Defendant.

### OPINION

JEANNE E. SCOTT, U.S. District Judge.
**\*1** This matter comes before the Court on Defendant Andrew Corporation's (Andrew Corp.) Motion to Transfer Venue Pursuant to § 28 U.S.C. § 1404 Or in the Alternative to Provide Relief Pursuant to 28 U.S.C. § 1406 (d/e 9) (Defendant's Motion). For the reasons set forth below, the Motion is ALLOWED.

On September 21, 2006, Plaintiff Industrias Kirkwood S.A. de C.V. (Industrias) brought this action against the Defendant in the Circuit Court of Sangamon County, Illinois. Pursuant to 28 U.S.C. §§ 1331 and 1441, the Defendant removed this action to this Court on October 19, 2006. *See Text Order entered November 2, 2006; Amended Notice of Removal (d/e 7).*

### BACKGROUND

Plaintiff brings a four-count Complaint (d/e 7)

against the Defendant. In Count I, Plaintiff alleges a breach of contract claim. Plaintiff alleges in Count II that the Defendant violated the Illinois Uniform Deceptive Trade Practices Act (UDTPA). In Count III, Plaintiff alleges a claim for fraud in the inducement. Plaintiff alleges in Count IV a promissory estoppel claim. According to the Complaint, Plaintiff is a Mexican corporation with its principal place of business in Mexico. Defendant states that it is a Delaware corporation with its principal place of business in Westchester, Illinois, which is within the Northern District of Illinois, Eastern Division. The Complaint states that Defendant's registered agent is located in Springfield, Illinois.

This action springs from Agreements entered into between the parties in 2004 and in 2005. The Complaint alleges that in March 2004, the parties entered into an Agreement in which Plaintiff Industrias agreed to manufacture and sell certain products, and Andrew Corp. agreed to purchase such products. To satisfy its obligations under the 2004 Agreement, Plaintiff Industrias incurred approximately $700,000.00 on labor, equipment, inventory, training and other related expenses.

The Complaint states that in January 2005, the parties entered into another Agreement in which Andrew Corp. agreed to sell certain assets and license related technology to Industrias, and Industrias in turn agreed to pay Andrew Corp. $100,000.00 for such purchases. Industrias claims it agreed to enter into the 2005 Agreement based on assurances from Andrew Corp. that it "would introduce its customers directly to [Industrias], and that the previously forecasted sales figures would be fulfilled by direct sales to those customers." *Complaint,* ¶ 15.

According to the Complaint, Industrias incurred significant expenses to comply with the terms of the 2004 and 2005 Agreements. The Complaint alleges that Defendant Andrew Corp., however, engaged in various acts that impeded Industrias from satisfying its obligations under the Agreements.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 2
Not Reported in F.Supp.2d, 2007 WL 925511 (C.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 925511 (C.D.Ill.))**

*ANALYSIS*

The Defendant has filed the instant Motion seeking to transfer venue, pursuant to 28 U.S.C. § 1404. In the alternative, the Defendant seeks to transfer venue pursuant to 28 U.S.C. § 1406. For the reasons set forth below, the Court grants Defendant's Motion.

*2 As an initial matter, the Court notes that "[v]enue in an action removed from state court to federal court is governed by the removal statue, 28 U.S.C. § 1441, not by the general venue statute, 28 U.S.C. § 1391."*Allied Van Lines, Inc. v. Aaron Transfer and Storage, Inc.,* 200 F.Supp.2d 941, 945 (N.D.Ill.2002). Therefore, "pursuant to § 1441, venue of a removed action is proper in 'the district court of the United States for the district and division embracing the place where such action is pending.' 28 U.S.C. 1441(a). Thus, a party may not challenge venue 'as if the case had originally been brought [in the removal court].' " *Id.*(quoting *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.,* 138 F.3d 65 (2nd Cir.1998)).

Under 28 U.S.C. § 1404, a district court may transfer a civil action "[f]or the convenience of parties and witnesses, in the interest of justice, ... to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Transfer is appropriate where the moving party clearly demonstrates that: "(1) venue is proper in the transferor district; (2) venue and jurisdiction are proper in the transferee district; and (3) the transfer will serve the convenience of the parties and witnesses and will promote the interest of justice." *Plotkin v. IP Axess, Inc.,* 168 F.Supp.2d 899, 902 (N.D.Ill.2001)."In assessing a motion to transfer, the court must consider the statutory factors in light of all of the circumstances of the case. The weight accorded to each factor is committed to the sound discretion of the court." *Avco Corp. v. Progressive Steel Treating, Inc.,* 2005 WL 2483379, at *1 (N.D.Ill.2005). In other words, it is within this Court's sound discretion to transfer an action. *Fondrie v. Casino Resource Corp.,* 903 F.Supp. 21, 23 (E.D.Wis.1995) (citing *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 219 (7th Cir.1986)).

As established above, venue is proper in the Central District of Illinois pursuant to § 1441(a).*See Allied Van Lines, Inc.,* 200 F.Supp.2d at 946. The Court further finds that venue is also proper in the Northern District of Illinois, Eastern Division. Industrias is a Mexican corporation with no corporate offices in Illinois or anywhere in the United States. Andrew Corp. is a Delaware corporation with its principal place of business in Westchester, Illinois. It has substantial connections to the Northern District of Illinois. None of its offices in Illinois are located in the Central District of Illinois. Indeed, Andrew Corp. asserts that it neither has any corporate offices and employees, nor any witnesses related to this action in the Central District of Illinois. *Defendant's Reply In Support of Motion to Transfer Venue (d/e 20) (Defendant's Reply)* at 2; *Defendant's Memorandum of Law (d/e 10),* Exh. 3, *Affidavit of James Bowen (Bowen Aff.).* It appears that Andrew Corp.'s only connection to the Central District of Illinois is that it uses a commercial service to receive process in Springfield, Illinois. For these reasons, the Court finds that venue is proper in the Northern District of Illinois, Eastern Division.

*3 The Court must now evaluate whether the transfer is for the convenience of parties and witnesses, and is in the interests of justice. Factors considered in determining the venue's convenience to parties and witnesses include: "(a) the plaintiff['s] choice of forum, (b) the situs of the material events, (c) the relative ease of access to sources of proof, (d) the convenience of the parties, and (e) the convenience of the witnesses." *Plotkin,* 168 F.Supp.2d at 902.

A court must typically accord substantial weight to the plaintiff's choice of forum if the forum is the plaintiff's home forum. *Deist v. Washington University Medical Center,* 385 F.Supp.2d 772, 773-74 (S.D.Ill.2005); *In re National Presto Industries, Inc.,* 347 F.3d 662, 664 (7th Cir.2003). The plaintiff's forum is entitled to less weight if "another forum bears a stronger relationship to the dispute." *Deist,* 385 F.Supp.2d at 774 (internal quo-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3
Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 925511 (C.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 925511 (C.D.Ill.))**

tation omitted). Industrias contends that its choice of forum should be entitled to deference based on the fact that Defendant has taken active steps to maintain a registered office in Springfield, Illinois. Based on the reasons discussed earlier, Industrias' contention is unavailing and so its choice of forum is not entitled to deference. "The Court further notes that this Court is not the plaintiff[']s] chosen forum, as [it] initially filed suit in state court and the case is here on removal...." *Id.*

Moreover, it appears that Industrias' only connection to the Central District of Illinois is the location of its counsel's office. However, location of plaintiff's counsel is generally accorded little or no consideration when choice of venue is merely for counsel's convenience. *See Sypert v. Miner,* 266 F.2d 196, 199 (7th Cir.1959) (inconvenience of plaintiff's counsel is not a controlling factor in transfer of venue consideration).

The second factor-the situs of the material events-tilts in favor of transfer. The alleged violations giving rise to the instant Complaint spring from the parties' negotiation and execution of the 2004 and 2005 Agreements. Andrew Corp. maintains that all of the events relevant to the instant action occurred in the Chicago area and, to some extent, Texas or Mexico. In support of its claims, Andrew Corp. has submitted an Affidavit of James Bowen, who is employed as the Base Station and Antennas Vice President and General Manager at Andrew Corp. *Bowen Aff.,* ¶ 3. He attests in his Affidavit that he is employed at Andrew Corp.'s facility located in Richardson, Texas. Bowen avers in his Affidavit that the 2004 and 2005 Agreements have no connection to the Central District of Illinois. He further states that based on his knowledge, Andrew Corp .'s employees that were involved in the alleged business transactions are or were employed at the company's facilities located in Richardson, Texas, Westchester, Illinois, and Orland Park, Illinois. *Id.* at ¶ 11.

In response, Plaintiff has submitted a Declaration of Emilio Grandio, President and CEO of Industrias.

*Plaintiff's Memorandum of Law In Opposition to Defendant's Motion to Transfer Venue (d/e 17), Exh. B. Declaration of Emilio Grandio (Grandio Decl.).* Grandio states in his Declaration that "[t]he 2004 Agreement was negotiated and executed in Texas" and that "[t]he 2005 Agreement was negotiated in Mexico and Texas, and was not executed at one single location." *Id.* at ¶¶ 7-8. He further avers: "no individuals involved in the negotiation and execution of the 2004 Agreement and the 2005 Agreement were located in the Chicago, Illinois area or the Northern District of Illinois at the time of negotiations or execution of these Agreements." *Id.* at ¶ 10.

*4 Based on the above, the parties appear to agree at least that the Central District of Illinois has no connection to the instant litigation because neither the 2004 nor the 2005 Agreement was negotiated or executed in this District. The parties, however, dispute whether the events pertinent to this action occurred in the Northern District of Illinois. Regardless, the second factor weighs slightly in favor of transfer because the 2005 Agreement was signed by John DeSana, on behalf of Andrews Corp., in the company's Orland Park, Illinois, facility. *See Complaint,* Exh. B, *The 2005 Agreement.*

The third factor also tilts in favor of transfer to the Northern District because, according to the Defendant, documents, files and tangible evidence pertinent to this action are maintained at its offices located within the Northern District of Illinois. *See Bowen Aff.* ¶ 12. Industrias, however, contends that the documents relevant to this case are maintained in Springfield, Illinois, and in Mexico. As the Defendant suggests, however, there is no indication that the documents maintained by the Plaintiff in Springfield, Illinois, were kept in the ordinary course of business. It appears that Plaintiff has transferred the relevant documents to Springfield for purposes of this action because its counsel's office is located in Springfield. The Court, however, recognizes that, in light of the advances in technology, either party could easily transfer the docu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-02799    Document 5-5    Filed 05/16/2008    Page 29 of 40

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 925511 (C.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 925511 (C.D.Ill.))

Page 4

ments relevant to this action to any other district. *See Euromarket Designs, Inc. v. Crate & Barrel Ltd.,* 96 F.Supp .2d 824, 840 (N.D.Ill.2000). Thus, this factor weighs neither for nor against transfer.

The fourth factor-the convenience of the parties-weighs in favor of transfer. In assessing this factor, the Court recognizes that "[v]enue should not be transferred solely to shift convenience from the plaintiff to the defendant." *Fondrie,* 903 F.Supp. at 23. This Court, however, has already established that there is no connection between the instant action and the Central District of Illinois, except for the location of Plaintiff's counsel. However, as discussed *supra,* the inconvenience of Plaintiff's counsel is not a controlling factor in considering whether to transfer an action. Moreover, neither the Plaintiff (a Mexican Corporation) nor the Defendant (a Delaware Corporation with its principal place of business located in the Chicago area) maintains any corporate offices in the Central District of Illinois. Additionally, as the Defendant correctly notes, it would be less costly and more convenient for witnesses to travel from Mexico to the Chicago area, a major metropolitan area, than from Mexico to Springfield, Illinois. *Defendant's Memorandum of Law* at 9. As such, this factor tilts in favor of transfer.

The fifth factor-the convenience of the witnesses-similarly weighs in favor of transfer. It is undisputed that the parties do not maintain any corporate offices in the Central District. It is further undisputed that the events pertaining to this action did not occur in the Central District. Indeed, neither Industrias nor Andrew Corp. has named any witnesses for which the Central District is a more convenient venue than the Northern District. Based on the parties' submissions, it appears, however, that all of the witnesses will be coming from the Chicago area, Texas, or Mexico.

**\*5** In considering this factor, the Court is mindful that it "must look to the nature and quality of the witnesses' testimony with respect to the issues of the case." *Law Bulletin Publishing, Co. v. LRP Pub-*

*lications, Inc.,* 992 F.Supp. 1014, 1018 (N.D.Ill.1998). Here, Defendant has not identified any of its key witnesses for trial. Defendant, however, states that its employees that were involved in the alleged transactions are located either in the Chicago area or in Texas. Defendant further asserts that it cannot provide a more specific witness list because "Plaintiff has refused, both in its pleadings and in pre-Motion conversations, to provide sufficient details about its theories and witnesses to develop a witness list." *Defendant's Reply* at 3. Even though the Defendant has not identified its key witnesses and has not provided a general statement of their respective testimony, the Court finds that this factor nonetheless weighs slightly in favor of transfer because the Chicago area, a major metropolitan area, would be more easily accessible to out-of-state witnesses and to foreign witnesses than Springfield, Illinois. In considering all of the relevant factors, the Court finds that the convenience to the parties and witnesses merits transfer to the Northern District of Illinois, Eastern Division.

The Court turns to the last factor, the interests of justice. To weigh the interests of justice, the Court "focuses on the efficient administration of the court system, rather than the private considerations of the litigants." *Plotkin,* 168 F.Supp.2d at 904 (internal quotations omitted). The Court considers "(1) the speed at which the case will proceed to trial, (2) the court's familiarity with the applicable law, (3) the relation of the community to the occurrence at issue, and (4) the desirability of resolving controversies in their locale." *Id.* The Northern District is equally capable of efficiently hearing Plaintiff's case. This factor, however, tilts slightly in favor of transfer because the Central District has no connection to the instant action. The interests of justice therefore merit transfer. Considering all of the factors set forth above, the Court finds that Defendant Andrew Corp. has established that transfer of this action to the Northern District, Eastern Division is warranted pursuant to 28 U.S.C. 1404(a). Based on this conclusion, the Court need not address Defendant's request pursuant to 28 U.S.C. §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-02799     Document 5-5     Filed 05/16/2008     Page 30 of 40     Page 5

1406.

### CONCLUSION

THEREFORE, for the reasons set forth above, Andrew Corp.'s Motion to Transfer Venue Pursuant to § 28 U.S.C. § 1404 Or in the Alternative to Provide Relief Pursuant to 28 U.S.C. § 1406 (d/e 9) is ALLOWED. This case is transferred to the Northern District of Illinois, Eastern Division.

IT IS THEREFORE SO ORDERED.

C.D.Ill.,2007.
Industrias Kirkwood S.A. de C.V. v. Andrew Corp.
Not Reported in F.Supp.2d, 2007 WL 925511 (C.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 73622 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 73622 (N.D.Ill.))**

Page 1

Northwestern Corp. v. Gabriel Mfg. Co., Inc.
N.D.Ill.,1996.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
The NORTHWESTERN CORPORATION, Plaintiff,
v.
GABRIEL MANUFACTURING CO., INC., Ashland Corporation of Delaware and G.V. National, Inc., Defendants.
**No. 96 C 2004.**

Feb. 16, 1996.

*MEMORANDUM OPINION AND ORDER*

ANDERSEN, District Judge.
**\*1** This action is before the court on the motion of defendants, Gabriel Manufacturing Company, Inc. ("GMCI"), Ashland Corporation of Delaware ("AshDel"), and G.V. National, Inc. ("National"), to dismiss GMCI as a party to this suit for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). Defendants further move to dismiss or transfer this action for improper venue pursuant to 28 U.S.C. § 1406(a) or, in the alternative, to transfer this case to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1404(a). For the following reasons, the motions are denied.

*BACKGROUND*

The plaintiff, Northwestern Corporation ("Northwestern"), is an Illinois corporation engaged in the business of manufacturing, advertising, and selling coin-operated vending machines. Specifically, plaintiff manufactures the "Model 60" vending machine at its headquarters in Morris, Illinois. In 1987, plaintiff received a federal trademark for its "Model 60" vending machine (Reg.

1,456,248) from the United States Patent and Trademark Office.

The defendant, GMCI, is a New York corporation which designs, develops, and manufactures parts for a number of different products including the coin-operated "Ashland" vending machine at its headquarters in Stony Point, New York. Defendant AshDel assembles the "Ashland" machines made from GMCI parts which defendant National then distributes throughout the country. Defendants AshDel and National are also located in New York and the surrounding metropolitan area.

GMCI has no property, agents, employees, distributors, or representatives in Illinois. From 1990 to 1995, however, GMCI conducted 6-8% of its annual business in the state of Illinois. These figures amount to roughly $90,000 to $120,000 per year out of GMCI's total yearly sales of $1.5 million. Moreover, GMCI's shipments into Illinois in 1994 increased to approximately $120,000 to $125,000. This increase allegedly coincided with an influx of "Ashland" vending machines into Illinois. According to Gerald Kutsche, an independent contractor employed by National to oversee its vending business, 300 to 350 of the "Ashland" machines have been shipped into Illinois every two to three weeks since April of 1994. Further, 70-80% of these machines remain in Illinois.

On March 31, 1995, plaintiff filed the instant six-count complaint against defendants alleging that the "Ashland" vending machines whose parts are manufactured by GMCI, assembled by AshDel, and distributed by National, infringe on plaintiff's "Model 60" trademark. Specifically, Count I of the complaint alleges that the manufacturing, selling, and operating of vending machines by defendants which are direct copies of plaintiff's "Model 60" machine constitute trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114. Count II alleges that the same conduct constitutes trafficking in counterfeit goods in violation of Sec-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Case 1:08-cv-02799 Document 5-5 Filed 05/16/2008 Page 32 of 40 Page 2
Not Reported in F.Supp., 1996 WL 73622 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 73622 (N.D.Ill.))**

tion 32 of the Lanham Act. Count III alleges that the unauthorized use of plaintiff's registered trademark by defendants constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Count IV alleges similar violations of the common law of unfair competition. Count V alleges that the same conduct violates the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq. Finally, Count VI alleges that defendants have diluted the distinctiveness of plaintiff's trademark in violation of the Illinois Anti-Dilution Act, 765 ILCS 1035/15.

**\*2** Defendants move to dismiss GMCI from this case for lack of personal jurisdiction and improper venue or, alternatively, to transfer this case to the United States District Court for the Southern District of New York. Defendants contend that GMCI lacks sufficient contacts with Illinois to satisfy general personal jurisdiction. Alternatively, defendants contend that subjecting GMCI to personal jurisdiction in Illinois offends constitutional due process. Defendants further assert that transfer of this case to the Southern District of New York serves the interests of the litigants and promotes judicial economy. Plaintiff argues that GMCI's business contacts with Illinois are substantial enough to satisfy both the personal jurisdiction requirements of the Illinois long-arm statute and the venue requirements of 28 U.S.C. § 1391. Additionally, plaintiff contends that the overwhelming interests of justice and judicial economy require that this action be heard in this district where plaintiff is located and defendants are engaged in substantial infringing activity.

*DISCUSSION*

In ruling on a motion to dismiss for lack of personal jurisdiction or to dismiss or transfer for improper venue, the court must accept all allegations of the complaint as true except those controverted by defendants' affidavits; any conflict in affidavits must be resolved in favor of the plaintiff. *Turnock v. Cope,* 816 F.2d 332, 333 (7th Cir. 1987); *National*

*Hydro Systems, a Div. of McNish Corp. v. Summit Constructors, Inc.,* 731 F.Supp. 264, 265 (N.D.Ill. 1989). The plaintiff's allegations must affirmatively establish jurisdiction and venue as to each defendant or be dismissed. *Haedike v. Kodiak Research, Ltd.,* 814 F.Supp. 679, 684 (N.D.Ill. 1992).

I. *Personal Jurisdiction*

This Court has personal jurisdiction over a non-resident defendant only if an Illinois court would have jurisdiction. *Nucor Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.,* 28 F.3d 572 (7th Cir. 1994); *FMC Corp. v. Varonos,* 892 F.2d 1308, 1310 (7th Cir. 1990). The plaintiff bears the burden of proving sufficient facts to establish personal jurisdiction. *E.J. McGowan & Associates, Inc. v. Biotechnologies, Inc.,* 736 F.Supp. 808, 809 (N.D.Ill. 1990); *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir. 1979). The plaintiff must first establish the existence of jurisdiction under Illinois law and then show that the exercise of jurisdiction over the defendant will not offend due process. *Jacobs/Kahan & Co. v. Marsh,* 740 F.2d 587, 589 (7th Cir. 1984); *Harold M. Pitman Co. v. Typecraft Software Ltd.,* 626 F.Supp. 305, 308 (N.D.Ill. 1986).

There are two ways in which a plaintiff can establish personal jurisdiction over a nonresident corporate defendant. First, Illinois' long-arm statute permits the exercise of jurisdiction over claims which arise out of the defendant's transaction of business, or commission of a tort, in Illinois. 735 ILCS 5/2-209(a)(1) and (2). The transaction of business test may be satisfied by an isolated act as long as the plaintiff's claim arises out of that act. *Marsh,* 740 F.2d at 591;*Johnston v. United Presbyterian Church in U.S. of America, Inc.,* 103 Ill.App.3d 869, 431 N.E.2d 1275 (Ill.App.Ct. 1981). Second, the long-arm statute also provides that an Illinois court may exercise jurisdiction over a "corporation doing business within this State."735 ILCS 5/2-209(b)(4). A corporation is "doing business" in Illinois if it engages in regular activities in Illinois, not occasionally or casually, but with "a fair meas-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 73622 (N.D.Ill.)

(Cite as: Not Reported in F.Supp., 1996 WL 73622 (N.D.Ill.))

ure of permanence and continuity." *Michael J. Neuman & Associates, Ltd. v. Florabelle Flowers, Inc.,* 15 F.3d 721, 724 (7th Cir. 1994); *Cook Associates, Inc. v. Lexington United Corp.,* 87 Ill.2d 190, 429 N.E.2d 847 (Ill. 1981). The decision as to whether a corporation's in-State activities are sufficiently permanent and continuous to qualify as "doing business" is to be made on a case-by-case basis and depends on the unique situation presented by a particular case. *Hulsey v. Scheidt,* 258 Ill.App.3d 567, 572, 630 N.E.2d 905, 908 (Ill.App.Ct. 1994); *Maunder v. DeHavilland Aircraft of Canada, Ltd.,* 102 Ill.2d 342, 466 N.E.2d 217 (Ill. 1984), *cert. denied,* 469 U.S. 1036 (1984).

*3 The constitutional due process analysis for personal jurisdiction imposes two requirements. First, the defendant must have sufficient minimum contacts with the state to comport with "traditional notions of fair play and substantial justice." *See International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement,* 326 U.S. 310 (1945); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985). The defendant must purposefully avail himself of the privilege of conducting activities in the forum state such that he invokes the benefits and protections of the law. *Hanson v. Denckla,* 357 U.S. 235 (1958). His activities must be of the quality and nature that he would anticipate being haled into that jurisdiction's court, *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980), and the relationship with the forum must not be "random, fortuitous, or attenuated." *Burger King Corp.,* 471 U.S. at 475-76. Second, there must be reasonably adequate notice to afford the party an opportunity to defend. *Id.*

In the instant case, GMCI's Illinois sales figures are not so insignificant as to preclude this Court from asserting general personal jurisdiction over GMCI. Over the last five years, GMCI's sales in Illinois ranged from $90,000 to $125,000 per year. More importantly, this activity accounted for an average of 6-8% of GMCI's gross annual sales. Illinois courts have found sales within the state as low as

1-2% of gross annual revenue to be adequate for conferring general personal jurisdiction. *See Hulsey,* 258 Ill.App.3d at 572, 630 N.E.2d at 908; *see also Neuman,* 15 F.3d at 721-22 (annual sales ranging from $10,000 to $47,000 out of a total of $4,000,000 in sales constituted "doing business" in Illinois). We conclude that GMCI's sales in Illinois over the last five years constitute "doing business" with "a fair measure of permanence and continuity" for purposes of the long-arm statute.

In addition, GMCI has sufficient minimum contacts with Illinois to comport with "traditional notions of fair play and substantial justice." *See International Shoe,* 326 U.S. 310. Plaintiffs allege that thousands of defendants' infringing machines have already entered Illinois. Considering the amount of business conducted in Illinois as well as the extent of GMCI's advertising and distribution schemes, it is reasonable that GMCI could anticipate being haled into court in Illinois. *See World-Wide Volkswagen,* 444 U.S. at 286.

Accordingly, we find that GMCI is "doing business" in Illinois for purposes of the long-arm statute. Further, the exercise of personal jurisdiction over GMCI does not offend constitutional due process. Therefore, the motion of defendants to dismiss GMCI from this case for lack of personal jurisdiction is denied.

## II. *Venue*

### A. *Motion To Dismiss Or Transfer For Improper Venue:*

The Court may dismiss a case for improper venue or, in the interest of justice, transfer the case to any district in which it could have been brought. 28 U.S.C. § 1406(a). Pursuant to 28 U.S.C. § 1391:

*4 (b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship, except as otherwise provided by law, may be brought only in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 73622 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 73622 (N.D.Ill.))**

(1) a judicial district where any defendant resides,... (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred,... or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

(c) For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.

For purposes of 28 U.S.C. § 1391, defendant GMCI resides in this district because we previously determined that it is subject to personal jurisdiction here. Accordingly, venue is proper in the Northern District of Illinois and, therefore, the motion of defendants to dismiss or transfer for improper venue under 28 U.S.C. § 1406(a) is denied.

### B. *Motion To Transfer Venue:*

In the alternative, defendants move to transfer venue to the Southern District of New York pursuant to 28 U.S.C. § 1404(a), which provides:

For the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Transfer is appropriate under Section 1404(a) when the moving party demonstrates that (1) venue is proper in the transferor district, (2) venue and jurisdiction are proper in the transferee district, and (3) the transfer will serve the convenience of the parties, the convenience of the witnesses, and the interest of justice. *Vandeveld v. Christoph,* 877 F.Supp. 1160, 1167 (N.D.Ill. 1995). Because the task of weighing factors for and against transfer "necessarily involves a large degree of subtlety and latitude," the decision to transfer is committed to the sound discretion of the trial judge. *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 219 (7th Cir. 1986).

In this case, the first two elements are not in dispute. Venue is proper in this forum, as explained above, as well as in the Southern District of New York. *See* 28 U.S.C. § 1391(b). Therefore, this Court's inquiry must focus on the third element, i.e., whether transfer will serve the convenience of the parties, the convenience of the witnesses, and the interests of justice.

In evaluating the convenience and fairness of transfer under Section 1404(a), the court must consider both the private interests of the parties and the public interest of the court. *See Gulf Oil Corporation v. Gilbert,* 330 U.S. 501 (1947). Private interests include: (1) plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof in each forum, including the court's power to compel the appearance of unwilling witnesses at trial and the costs of obtaining the attendance of witnesses; and (4) convenience to the parties--specifically, their respective residences and abilities to bear the expense of trial in a particular forum. *Von Holdt v. Husky Injection Molding Systems, Ltd.,* 887 F.Supp. 185, 188 (N.D.Ill. 1995); *Medi USA v. Jobst Institute, Inc.,* 791 F.Supp. 208, 210 (N.D.Ill. 1992); *see generally* 15 Charles A. Wright, Arthur R. Miller & E. Cooper, Federal Practice and Procedure §§ 3840-53 (1986). Public interest factors include the court's familiarity with applicable law and the desirability of resolving controversies in their locale. *See Van Gelder v. Taylor,* 621 F.Supp. 613, 619 (N.D.Ill. 1985).

**\*5** The party seeking a Section 1404(a) transfer bears the burden of showing that the "transferee forum is clearly more convenient" than the transferor forum. *Heller Financial, Inc. v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1293 (7th Cir. 1989). Transfer is inappropriate if it "merely transforms an inconvenience for one party into an inconvenience for another party." *Sage Products, Inc. v. Devon Industries, Inc.,* 148 F.R.D. 213, 216 (N.D.Ill. 1993)(citations omitted).

### 1) *Plaintiff's Choice of Forum*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 73622 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 73622 (N.D.Ill.))**

A plaintiff's choice of forum is entitled to substantial weight under Section 1404(a), particularly when it is also the plaintiff's home forum. *Vandeveld,* 877 F.Supp. at 1167. Thus, the fact that plaintiff has brought this action in the Northern District of Illinois, its home forum, weighs heavily against transfer.

### 2) *Situs of Material Events*

This Court reviews the situs of material events to determine whether a lawsuit has any material relationship to this district. This action is for trademark infringement. Contrary to defendants' assertions, the location of the infringer is not the only relevant factor. Rather, a "substantial part" of the events triggering trademark infringement may occur both in the district where the infringer is located and where the trademark owner is located and confusion is likely to occur. *See, e.g., Sidco Industries, Inc. v. Wimar Tahoe Corp.,* 768 F.Supp. 1343, 1346 (D.Ore. 1991). In the instant case, plaintiff alleges that confusion is likely to occur in Illinois where GMCI's machines are already in place. Therefore, this factor weighs in favor of plaintiff's home forum which has a substantive relationship to this cause of action.

### 3) *Convenience of the Witnesses and Parties*

The Court next examines the convenience of the witnesses and parties as well as the relative ease of access to sources of proof in each forum. "Probably the most important factor is whether another forum would better serve the convenience of witnesses..." 15 Wright, Miller & Cooper, Federal Practice and Procedure § 3815 at 415. The party seeking transfer must clearly specify the key witnesses to be called and make a general statement of their testimony. *Vandeveld,* 877 F.Supp. at 1167-68.

The defendants generally contend that "all of the files and records of defendants GMCI, AshDel, and National are located in the New York Metropolitan

area." However, the same could be argued for plaintiff's files and records. Defendants further specify that relevant witnesses such as GMCI's president, the designer of the alleged infringing device, manufacturers and vendors of alleged infringing parts, as well as individuals responsible for the assembly, promotion, sale, distribution and placement of the machines are all located in or around New York City. In a trademark infringement case, however, the likelihood of confusion to the consuming public is the main issue. The location of the defendants' witnesses, such as the designer and vendors of the alleged infringing product, is not of prime importance, particularly when it would be just as inconvenient for plaintiff's witnesses to proceed out of state. In this case, transfer would merely transform inconvenience for defendants' witnesses into inconvenience for plaintiff's witnesses. Accordingly, this factor also weighs against transfer to the Southern District of New York.

### 4) *Overall Interests of Justice*

**\*6** The final consideration under Section 1404(a) is whether a change of venue would serve the interests of justice. This factor focuses on the efficient administration of the court system, rather than the private considerations of the litigants. *Espino v. Top Draw Freight System, Inc.,* 713 F.Supp. 1243, 1245 (N.D.Ill. 1989). Specifically, public interest factors include the court's familiarity with applicable law and the desirability of resolving controversies in their locale. *See Van Gelder,* 621 F.Supp. at 619.

Here, the overall interests of justice militate against transfer to the Southern District of New York. This action concerns the alleged infringement of a trademark owned by a plaintiff domiciled and doing business in this forum. Plaintiff's complaint alleges several violations of federal trademark law including Sections 32, 35 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1117, and 1125(a), with which this Court is familiar and capable of adjudicating. Plaintiff also alleges violations of the common law

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of unfair competition, the Illinois Uniform Deceptive Trade Practices Act, and the Illinois Anti-Dilution Act. New York federal courts would not provide a better forum to litigate these Illinois state law claims.

### 5) *Conclusion as to Factors 1 Through 4*

Accordingly, the Court finds that defendants have failed to carry their burden of proving that the considerations embodied in Section 1404(a) weigh heavily in favor of transfer. On the contrary, the interests of justice and the convenience of parties and witnesses weigh against transfer of this case to the Southern District of New York. Therefore, the motion of the defendants to transfer this case to the Southern District of New York pursuant to 28 U.S.C. § 1404(a) is denied.

### CONCLUSION

For all of the foregoing reasons, the motion of defendants for the dismissal of GMCI from this case for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) is denied. The motion of defendants to dismiss or transfer for improper venue pursuant to 28 U.S.C. § 1406(a) or, in the alternative, to transfer this case to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. 1404(a) is also denied.

It is so ordered.

N.D.Ill.,1996.
Northwestern Corp. v. Gabriel Mfg. Co., Inc.
Not Reported in F.Supp., 1996 WL 73622 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 1
Slip Copy, 2007 WL 772946 (N.D.Ill.)
**(Cite as: 2007 WL 772946 (N.D.Ill.))**

C

Timebase Pty Ltd. v. Thomson Corp.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
TIMEBASE PTY LTD., Plaintiff,
v.
The THOMSON CORPORATION, Defendant.
**No. 07 C 460.**

March 9, 2007.

Joseph Nevi Hosteny, III, Arthur Anthony Gasey,
Niro, Scavone, Haller & Niro, Ltd., Chicago, IL,
for Plaintiff.
Barry F. Irwin, Kirkland & Ellis LLP, Chicago, IL,
Calvin L. Litsey, Chad M. Drown, David J.F.
Gross, Faegre & Benson LLP, Minneapolis, MN,
for Defendant.

*MEMORANDUM OPINION AND ORDER*

GEORGE W. LINDBERG, Senior U.S. District
Judge.
**\*1** Defendant The Thomson Corp. ("Thomson")
FN1 moves this court pursuant to 28 U.S.C. §
1404(a) to transfer jurisdiction of this case to the
United States District Court of Minnesota. For the
reasons set forth below, the motion is granted.

> FN1. In a footnote, Thomson states that it
> is not the proper defendant to this suit and
> that plaintiff should have named West Pub-
> lishing Corp. and West Services, Inc. as
> defendants. This issue is not before the
> court and was not briefed by the parties.

*I. RELEVANT FACTS*

Plaintiff Timebase Pty Ltd. ("Timebase") is an
Australian company, with its principal place of
business in Sydney, Australia. Timebase owns, by
assignment, United States Patent No. 6,233,592
(the "'592 patent") and has sued Thomson pursuant

to 35 U.S.C. § 271 for alleged infringement of that
patent. Thomson is a Canadian corporation that
sells publishing services and products throughout
the United States, including both the Northern Dis-
trict of Illinois and the District of Minnesota. In its
complaint, Timebase does not specify which Thom-
son product(s) allegedly infringes the '592 patent.

In its motion to transfer, Thomson takes the posi-
tion that this suit involves its PastStat Locator
product because that is the product Timebase iden-
tified in the parties' pre-suit discussions. The Past-
Stat Locator is a component of Westlaw.com, an
online research tool available nationwide. In its re-
sponse brief to the motion to transfer, Timebase
identifies the PastStat Locator, Graphical Statutes
and RegulationsPlus products, which are all com-
ponents of Westlaw.com, as allegedly infringing
the '592 patent. However, Timebase does not argue
that the inclusion of the Graphical Statutes and
Regulations Plus products in the suit alters the facts
relevant to the resolution of this motion. Therefore,
for purposes of this motion, the court will limit its
analysis to the PastStat Locator. This is appropriate
because Timebase failed to identify the alleged in-
fringing product(s) in its complaint, Thomson lim-
ited the analysis in its motion to transfer to the
PastStat Locator, and the relevant facts are the
same regardless of whether the suit is limited to the
PastStat Locator, or also includes the other two
Westlaw.com components.

The research, design and development of the Past-
Stat Locator occurred in Minnesota. Further, the as-
sociated research, design and development docu-
mentation and the central hardware and software
necessary to operate the PastStat Locator are loc-
ated there. Although PastStat Locator's necessary
hardware and software are physically located in
Minnesota, the product itself is an online tool that
is marketed, sold and used throughout the United
States. Thomson's party and non-party witnesses
are also in Minnesota. Thomson identified eighteen
relevant witnesses, fifteen employees and three

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

former employees, who reside in the Minneapolis/ St. Paul metropolitan area. Timebase identified seven additional possible witnesses for Thomson. Six of them live in Minnesota, maintain a residence in Minnesota, or live within the subpoena power of a Minnesota federal court.

Timebase does not have any witnesses who reside in the United States. There is also no evidence that Timebase has relevant documentation, or other evidence located anywhere in the United States, much less the Northern District of Illinois. Finally, representatives from Timebase traveled to Minnesota, not the Northern District of Illinois, to conduct pre-suit discussions with representatives from Thomson.

## II. LEGAL ANALYSIS

*2 Section 1404(a) provides: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."In other words, a transfer is appropriate if: (1) venue is proper in both the transferor and transferee courts; (2) transfer will serve the convenience of the parties and witnesses; and (3) transfer is in the interest of justice. *See Boyd v. Snyder,* 44 F.Supp.2d 966, 968 (N.D.Ill.1999). Whether to transfer a case is within the sound discretion of the transferor court. *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 219-20 (7th Cir.1986). The party requesting transfer bears the burden of demonstrating that the transferee forum is clearly more convenient than the transferor forum. *Id.*

Both parties concede that venue is proper in this court and the District of Minnesota. Therefore, the court proceeds directly to an analysis of the second factor, whether transfer will serve the convenience of the parties and witnesses. This factor weighs strongly in favor of transfer. In accessing the convenience of the parties and witnesses, the Court considers five sub-factors. *See Hanley v. Omarc, Inc.,* 6 F.Supp.2d 770, 774 (N.D.Ill.1998). First, the

court looks to the plaintiffs' chosen forum, which is normally accorded deference. In this case, the deference is minimal because plaintiff does not reside in the Northern District of Illinois. *Childress v. Ford Motor Co.,* 03 C 3656, 2003 WL 23518380 at *3 (N.D.Ill.Dec.17, 2003).

The next factor, the situs of the material events, is irrelevant because this is a patent case. *See Sitrick v. FreeHand Systems, Inc.,* No. 02 C 1568, 2003 WL 1581741, at *3 (N.D.Ill. Mar.27, 2003). The third factor, the convenience of the witnesses, strongly favors transfer. There is not a single relevant witness located in the Northern District of Illinois. In fact, all of Timebase's witnesses reside outside of the United States. If this case proceeds to trial, regardless of the forum, each of Timebase's witnesses will have to travel internationally. For purposes of convenience, whether the their ultimate destination is Chicago or Minneapolis does not appear material. Alternatively, all but one of the twenty-five relevant Thomson witnesses, as identified by both Timebase and Thomson, live in Minnesota, maintain a residence in Minnesota, or live within the subpoena power of a Minnesota federal court. Further, at least three of those witnesses are non-party witnesses who would be within the subpoena power of a Minnesota federal court, but would not be within the subpoena power of this court. Minnesota is clearly more convenient for Thomson's relevant witnesses and is not any less convenient for Timebase's witnesses than the Northern District of Illinois.

The last two sub-factors, the relative ease of access to sources of proof in both forums and the convenience of the parties in litigating in each respective forum, also weigh in favor of transfer. No sources of proof are located in Illinois and all of Thomson's evidence is in Minnesota. Thomson's relevant research, testing and design documentation is in Minnesota, along with the central hardware and software necessary to operate the PastStat Locator. Further, Thomson's employees and the people most knowledgeable about this case are located in Min-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

nesota. If this case remains in the Northern District of Illinois, Thomson would have to transport its sources of proof outside of Minnesota.

**\*3** Timebase will have to transport its sources of proof regardless of the forum. All of Timebase's sources of proof are located outside of the United States, presumably in Australia and Europe, although Timebase did not provide the exact location. Timebase's counsel is located in the Northern District of Illinois, however, the court does not consider the convenience of a party's counsel in a § 1404(a) transfer analysis. *See Chicago, Rock Island & Pac. R.R. Co. v. Igoe,* 220 F.2d 299, 304 (7th Cir.1955); *China Industries (USA), Inc. v. New Holland Tire, Inc.,* 2006 WL 2290975 at 2 (N.D.Ill.2006). There is no evidence that litigation before this court, as opposed to a court in Minnesota, would be more convenient for Timebase. However, there is substantial evidence that it would be more convenient for Thomson to litigate this case in Minnesota.

Finally, the court must consider whether transfer is in the interest of justice. The interest of justice component of a § 1404(a) analysis concerns the "efficient administration of the court system." *Coffey,* 796 F.2d at 221. In making this determination, the court considers each proposed forum court's familiarity with the applicable law, the speed at which the case will proceed to trial, and the desirability of litigating the case in each locale. *See Amoco Oil Co. v. Mobil Oil Corp.,* 90 F.Supp .2d 958, 961 (N.D.Ill.2000). Patent infringement is a question of federal law. This court and the District of Minnesota are equally familiar and capable of deciding questions of federal law, thus this factor is neutral to the § 1404(a) analysis.

Next, the court considers which proposed district will provide the parties with the fastest progression to trial. The two most relevant statistics are the median months from filing to disposition of a case and the median months from filing to trial. *Amoco,* 90 F.Supp.2d at 962. In 2005, the median months from filing to disposition was 7.5 for the District of Min-

nesota and 6.9 for the Northern District of Illinois. In 2006, that statistic increased dramatically to 23.8 in the District of Minnesota and remained relatively stable at 6.5 in this court. That 2006 statistic was an aberration for the District of Minnesota, caused by the termination of a large multi-district litigation. The median months from filing to trial in 2005 was 23 months in the District of Minnesota and 27 in the Northern District of Illinois. That statistic was 26.4 for both districts in 2006. The relevant statistics for both forums are similar, however, they are slightly more favorable in this court, thus minimally weighing against transfer.

The last interest of justice related factor, the desirability of litigating the case in each proposed forum, favors transfer. This case has absolutely no relevant connection to this district. Not a single party, witness, or source of proof is located in the Northern District of Illinois. Further, the PastStat Locator is an online tool that is marketed, sold and used throughout the country. The fact that it is marketed, sold and used in this district does not weigh against transfer because that fact is true of every other federal district in the United States. Alternatively, this case has considerable relevance to the District of Minnesota. Not only is the PastStat Locator marketed, sold and used there, but Thomson's employees, relevant witnesses and sources of proof are located in Minnesota. Additionally, the PastStat Locator was created in Minnesota and the central hardware and software necessary for its operation are there.

### III. CONCLUSION

**\*4** On these facts, the court finds that transfer to Minnesota pursuant to § 1404(a) is appropriate. The lack of any relevant connection between this district and this litigation and the presence of a strong connection to the District of Minnesota strongly outweighs the minimal deference accorded Timebase's choice of forum and the fact that this court may provide for a slightly faster disposition of the case.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ORDERED: Defendant's motion to transfer venue
to the District of Minnesota [10] is granted.

N.D.Ill.,2007.
Timebase Pty Ltd. v. Thomson Corp.
Slip Copy, 2007 WL 772946 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I filed a copy of the foregoing with the Clerk of the Court using the ECM/ECF system.  I further certify that a copy of the foregoing *Cummins Inc.'s Motion to Transfer Venue* was served on May 16, 2008 by First-Class United States Mail, postage prepaid on the following counsel of record:

> Robert Ostojic
> ro@lefltd.com
> LEAHY, EISENBERG & FRAENKEL, LTD
> 161 North Clark Street
> Suite 1300
> Chicago, IL  60601
> Telephone:  (312) 368-4554

_____/s/ Brendan J. Healey_____
An Attorney for Defendant

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY, as subrogee of FROCK BROS. TRUCKING, INC., | ) ) ) ) | Case No. 08 CV 2799 |
| Plaintiff, | ) ) | Judge Dow |
| v. | ) ) | Magistrate Valdez |
| CUMMINS INC., | ) ) ) | |
| Defendant. | ) | |

## NOTICE OF MOTION

To:     Robert Ostojic
        LEAHY, EISENBERG & FRAENKEL, LTD
        161 North Clark Street, Suite 1300
        Chicago, IL  60601

**PLEASE TAKE NOTICE** that on **Wednesday, May 21, 2008** at **9:15 a.m.**, or as soon thereafter as counsel may be heard, we shall appear before the Honorable Judge Robert M. Dow, Jr. in Room 1919 of the Dirksen Federal Building located at 219 South Dearborn Street, Chicago, Illinois, and then and there present the attached Defendant Cummins Inc.'s Motion to Transfer and memorandum in support thereof, copies of which are hereby served upon you.

Respectfully Submitted,


___/s/ Brendan J. Healey_____
Attorney for Cummins Inc.

Brendan J. Healey                       J. A. Felton
Mandell Menkes LLC                      Dan E. Cranshaw
333 West Wacker Drive, Suite 300        Lathrop & Gage L.C.
Chicago, Illinois 60606                 2345 Grand Boulevard, Suite 2800
(312) 251-1000                          Kansas City, Missouri 64108-2684
                                        (816) 292-2000

May 16, 2008

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY, as subrogee of FROCK BROS. TRUCKING, INC., | ) ) ) ) ) | Case No. 08 CV 2799 |
| Plaintiff, | ) ) | Judge Dow |
| v. | ) ) | Magistrate Valdez |
| CUMMINS INC., | ) ) ) | |
| Defendant. | ) | |

## <u>ORDER</u>

This matter comes before the Court upon a Motion to Transfer Venue filed by the Defendant.

IT IS HEREBY ORDERED that Defendant's Motion to Transfer Venue is GRANTED; and

IT IS FURTHER ORDERED that this cause is transferred to the United States District Court for the District of Nebraska, Lincoln.


Dated:_____          _____
                                                         United States District Judge

Prepared by:

Brendan J. Healey
Mandell Menkes LLC
333 West Wacker Drive, Suite 300
Chicago, Illinois 60606
(312) 251-1000

J. A. Felton
Dan E. Cranshaw
Lathrop & Gage L.C.
2345 Grand Boulevard, Suite 2800
Kansas City, Missouri 64108-2684
(816) 292-2000

Attorneys for Defendant

CC 2006612v1